[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-13177

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 26, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-80462-CV-DTKH

RONALD THAETER,

Plaintiff-Appellant,

versus

PALM BEACH COUNTY SHERIFF'S OFFICE,
ED BIELUCH, former Sheriff,
in his individual capacity and RIC L. BRADSHAW,
in his official capacity as Sheriff of Palm
Beach County,*

Defendants-Appellees.

_____

No. 03-13197

_____

D.C. Docket No. 02-80463-CV-DTKH

TIMOTHY MORAN,

Plaintiff-Appellant,

versus

PALM BEACH COUNTY SHERIFF'S OFFICE,
ED BIELUCH, former Sheriff,
in his individual capacity and RIC L. BRADSHAW,
in his official capacity as Sheriff of Palm
Beach County,*

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(May 26, 2006)**

Before BIRCH, KRAVITCH and CUDAHY,** Circuit Judges.

BIRCH, Circuit Judge:

This consolidated appeal presents the issue of whether photographs and

videotapes of deputy sheriffs engaging in sexually explicit, off-duty conduct

available for pay-per-view on the Internet is entitled to First Amendment

protection. The district court granted the motion to dismiss of the sheriff who

approved the terminations of the participating deputy sheriffs. We affirm.

_____

*Ric L. Bradshaw, the current Sheriff of Palm Beach County, has been substituted for Ed
Bieluch in his offical capacity pursuant to Federal Rule of Appellate Procedure 43(c)(2).
**Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit,
sitting by designation.

# I. BACKGROUND

Plaintiffs-appellants Ronald Thaeter and Timothy Moran were deputy sheriffs with the Palm Beach County Sheriff's Office ("PBCSO"). Prior to the fall of 2000, they agreed to participate in sexually explicit photographs and videotapes for dissemination on pay-per-view websites operated by Elizabeth Maxwell, the wife of a third deputy sheriff, Jack Maxwell, who also was a participant.[1] Elizabeth Maxwell conducted a one-time photographing session in a hotel room during which hundreds of photographs as well as videotapes were taken of group sexual activity. The participants understood that the photographing and videotaping were being created for distribution on her pay-per-view website. Officers Thaeter, Moran, and Maxwell did request that their faces be obscured or disguised because of their concern for the sensitivity of their jobs as police officers, but the film editing was not successful in preventing them from being identified.

Officer Thaeter appeared in still photographs showing acts of intercourse, masturbation, and oral sex with multiple partners. These photographs together with photographs that involved the use of a PBCSO marked police car were posted on several pornographic websites on the Internet. Officer Thaeter additionally

---

[1] Maxwell was not a party in the lawsuit because he voluntarily resigned his position after the internal affairs investigation commenced.

participated in production of a "streaming video" or "real-time" movie, in which he engaged in intercourse, masturbation, and oral sex with his wife, Sorphea Thaeter, for broadcast on three pay-per-view websites. Officer Moran participated in explicit group sexual activity shown in still photography disseminated over the websites, but he was not featured in any streaming videos.

In October 2000, a private citizen made an anonymous complaint to the PBCSO and reported the participation of the police officers in sexual activity displayed on the websites. The citizen also stated that the graphic materials portrayed included a nude female posing on marked patrol cars possibly owned by the PBCSO. Consequently, PBCSO Captain Mills submitted employee misconduct charges for the officers to the Office of Professional Regulation, which ordered an investigation by the Bureau of Internal Affairs.

Investigator Paula Kronsperger conducted the investigation and interviewed the three officers and Elizabeth Maxwell. She also contracted for thirty-day memberships in the four websites involved to inspect visually the subject photographs and videos. After reviewing hundreds of photographs, Investigator Kronsperger located a few where the faces of Officers Thaeter, Moran and Maxwell were identifiable, but she found no association with the PBCSO discernible to anyone not personally acquainted with the officers. She further

4

noted that all the photographic materials appeared to involve consensual sexual activity.

Investigator Kronsperger's report focused on three areas of misconduct by the officers: (1) use of a PBCSO patrol vehicle, (2) an ethical violation under the Code of Ethics used by the PBCSO, and (3) other identifiable misconduct. Because Investigator Kronsperger's investigation revealed that the implicated PBCSO vehicle involved only Officer Maxwell and his wife, who were not parties in this case in district court and, consequently, not parties in this appeal, we need not consider that issue.[2] Investigator Kronsperger described her investigation into

[2] On the website belonging to Elizabeth Maxwell, Investigator Kronsperger reported:

> The primary visitor's page . . . did show two photographs of a female leaning against a marked Sheriff's Office patrol vehicle. The female, who was leaning against the side of the car, obscured the county name on the side of the vehicle. In one of the photographs, the female was handcuffed and nude. The second photograph showed her partially clothed. While the viewer of the photographs would certainly draw the inference that the vehicle was associated with law enforcement, there were no clear identifying marks to associate the vehicle with the Palm Beach County Sheriff's Office. Additionally, there was no agency name visible anywhere on the vehicle.

Folder I, Exh. A at 4. In interviewing Officer Maxwell, Investigator Kronsperger reported that he "said that the vehicle in the picture was, in fact, the marked Palm Beach County Sheriff's Office patrol vehicle that had been issued to him. D/S Maxwell said that he was not, however, the person who took the photograph, nor was he present when the picture was taken." Id. at 7. Because of her inability to obtain a statement from Elizabeth Maxwell, Investigator Kronsperger found that the charge for "(IX) Improper Conduct, (29) Intentional Abuse of Sheriff's Office Equipment" was not sustained. Id. at 12. She noted, however, that "[w]hile the placement of the vehicle on the web-site would rise to the level of a policy violation, Elizabeth Maxwell is not subject to the rules and regulations of the Palm Beach County Sheriff's Office." Id.

5

an ethical violation by the officers as determining "whether or not the Deputies['] appearance on the web-sites rises to the level of an ethics violation."  Folder I, Exh. A at 12.  The Code of Ethics utilized by the Palm Beach County Sheriff's Office makes only this statement pertaining to a deputy's personal life: **"I will keep my private life unsullied as an example to all."**  Id.

Investigator Kronsperger explained her reasoning for concluding that the subject Code of Ethics (II) was not violated because of "policy failure" as follows:

> The nature of the Deputies['] actions is not in question.  The application of the policy is where questions arise.  The above referenced policy statement is vague, in that, the intended communication of the policy to the employee is completely non-specific.  Certainly, there are many non-criminal acts that would "sully" or tarnish one's private life.  Which acts, and in this case off-duty acts, are to be applied to the policy?  I researched the Canons of Ethics in order to locate any other guidelines that would govern the off-duty conduct of D/S Maxwell, D/S Thaeter, and D/S Moran.  That search also met with negative results.
>
> As an investigator, I am charged with the responsibility of identifying specific facts and making recommendations, based solely on those facts, as to whether or not a preponderance of evidence has been established to prove or disprove the existence of a policy violation.  As there is no place for personal opinion in a fact-finding investigation, I must therefore recommend this aspect of the Code of Ethics be viewed as a policy failure.  Due to it[]s general verbiage, this particular policy statement would inevitably entail the rendering of a subjective opinion and/or individual interpretation in order to arrive at any finding, whether sustainable or not.  I would be remiss in my responsibilities as an Investigator if I did not raise this issue for consideration.

6

Id. at 13, ¶¶ 2-3.

Investigator Kronsperger also identified other misconduct with respect to the rules and regulations governing off-duty employment of PBCSO employees: "Sheriff's Office personnel shall obtain prior written approval from the Sheriff, using the approved request form, before engaging in other employment, occupation, profession or commercial enterprise." Id. at 13 (IX (16) Off-Duty Employment of the Sheriff's Department Rules and Regulations) (emphasis added). In analyzing this identified misconduct by the officers, Investigator Kronsperger determined that "[t]he Deputies did not seek or obtain written approval from the Sheriff in order to participate in their activities on the web-sites. Certainly, their requests would have been denied." Id. While the implicated deputies contended that they were not engaging in outside employment because they had no ownership in the websites, Investigator Kronsperger concluded that

> there is a violation of policy as it relates to off-duty employment. D/S Maxwell, D/S Thaeter and D/S Moran did "involve themselves, and take part in," Elizabeth Maxwell's and Bob Hall's pornographic business enterprises. The participation included the following:
>
> • Posing for photographs depicting multiple partner sexual encounters.
>
> • Knowledge that the sole purpose of their appearances in the photos and attendance at the photo shoots was to acquire enough photographic material to fill photo galleries for three pornographic web-sites.

- Signing a release allowing Elizabeth Maxwell to have exclusive rights to the use of the photographs.

- Receipt of financial gains, albeit indirectly through their spouses, from earnings acquired from the web-sites.

Id. at 14 (second emphasis added).

Investigator Kronsperger additionally determined that

the Deputies['] participation in the web-sites, by design, was meant to be secretive. This is supported by the following facts:

- The faces of the three men are obscured in all but a handful of the photographs on the web-sites.

- Failure to request written permission to participate in pornographic web-sites.

- The two web-sites that featured the wives of D/S Moran and D/S Thaeter were immediately shut down when D/S Thaeter and D/S Moran received notification of this investigation. The remaining site featuring Elizabeth Maxwell was not shut down, but at that point D/S Maxwell had already resigned his position with the Palm Beach County Sheriff's Office and was openly appearing on her web-site with no effort to conceal his identity.

- The web-sites were registered only in the names of the women. Any financial gains were, therefore, reportedly only paid to the women. The acquisition of earnings from the web-sites being paid only to the women is a technicality dwelled upon by Deputies in order to create the appearance of separating themselves from the business aspects of the web-sites. All parties performed on the web-sites. Even if the financial gains were paid only to the women, the Deputies certainly would have had an expectation of financial gain through their own participation.

8

Id. at 14-15 (emphasis added). Accordingly, Investigator Kronsperger recommended that the officers' violation of IX(16) Off-Duty Employment had been sustained factually.

On December 23, 2000, Administrative Manager Frank DeMarco of Internal Affairs of the PBCSO reversed Investigator Kronsperger's findings, which he addressed to Assistant Director Arthur Owen of the Office of Professional Regulation. DeMarco, who initially had been with the New York City Police Department and had been with the PBCSO for twenty-two years, explained his reasoning for recommending reversal of Investigator Kronsperger's factual findings based upon the Code of Ethics of the Sheriff's Department that officers are to keep their private lives "unsullied as an example to all":

> What one does in the privacy of their home is something that is sacred, should not be compromised, and is protected by the constitution. However, I believe that <u>once these individuals made a conscious, adult decision to involve themselves and their wives in pornography on the Net, they crossed the line and exposed themselves to both criticism and scrutiny of this agency</u>. The fact that what they are doing may not be illegal does not have a bearing on whether or not the conduct is offensive or embarrassing to the Palm Beach County Sheriff's Office. It is also true that <u>whether or not this conduct is immoral or offensive to the community should not have any impact on this agency's ability to denounce the individuals or to punish them.</u>
>
> There is another equally compelling reason for my reversal of Investigator Kronsperger's finding and that is officer credibility. During my tenure with the Public Defender's Office, it was common

9

practice for all trial attorneys to do Internal Affair backgrounds on law enforcement officers prior to trial. The reasoning is obvious; attack officer credibility. An allegation such as this, whether sustained or not, would destroy any officer's credibility and would not be limited to moral or judg[]ment issues.

    . . . .

I have encountered deplorable behavior on the part of Law Enforcement Officers during my tenure as a police officer, but I find what these individuals have done is unconscionable and truly an embarrassment to all members of this agency and to the Law Enforcement community in general. In order for Law Enforcement to have the respect of the community they serve, they must hold themselves to a higher standard of behavior at all times—not just while on duty.

    . . . .

I would be remiss in my duty as Administrator of Internal Affairs to stand by[,] remain silent, and allow these men to blemish the integrity, honor and reputation of this fine agency and the men and women who serve our community.

Id., Exh. B at unnumbered 2, unnumbered 3 (emphasis added).

Lieutenant Ann Burke, Executive Officer of the Internal Affairs Bureau rejected Investigator Kronsperger's recommendations, concluded that the deputies' behavior violated the Code of Ethics (II) of the Sheriff's Department, and warranted referral for disciplinary action:

The investigation revealed that Deputy Jack Maxwell, Deputy Ron Thaeter, and Deputy Tim Moran were involved in "sexually explicit photographs depicting acts of intercourse, masturbation, and oral sex, all which were with multiple partners." These photographs were posted on several different pornographic web sites on the Internet, which also involved the use of a PBSO marked police car. Deputy Thaeter and Deputy Maxwell were discovered to have appeared in "streaming video," better described as pornographic "real-time" movies depicting live sex, masturbation, and oral sex. These

10

"movies" made no attempt to disguise either the face of Deputy Maxwell or Deputy Thaeter.

Several of the pornographic photographs that appear on these web sites did make an attempt to disguise the faces of Deputy Maxwell, Deputy Thaeter and Deputy Moran. During their sworn statements to Investigator Kronsperger, <u>both Deputy Moran and Deputy Thaeter admit that they demanded to have their faces disguised in the photographs because they are "deputies" and their actions, during their off-duty hours, would cause work-related scrutiny</u>. However, despite the fact that they are "deputies" and the inherent risk involved, all three of these deputies agreed to participate in pornographic images and movies that could be viewed anywhere, anytime, by anyone in the world with Internet access and a credit card. Furthermore, <u>their involvement in this pornographic Internet sex show was a business endeavor, from which all three deputies received financial benefit</u>.

<u>The actions of Deputy Maxwell, Deputy Thaeter, and Deputy Moran clearly demonstrate a violation of moral character and, certainly, their commitment to keep their private lives unsullied as an example to all. As Law Enforcement officers, we are held to a higher standard of moral character.</u> We must recognize that the badge of our office is a symbol of public faith and public trust. <u>The poor judg[]ment exercised by Deputy Maxwell, Deputy Thaeter, and Deputy Moran with regard to their off-duty conduct is exceptionally egregious. Their direct involvement in publicly viewed pornography sullies not only their personal life and professional reputation; it sullies the public perception of the Palm Beach County Sheriff's Office.</u>

Id., Exh. C at 1-2 (Decision of Lieutenant Ann S. Burke, Office of Internal Affairs (Jan. 25, 2001)) (emphasis added).

Following notification that the internal investigation tentatively had substantiated allegations of violating regulation sections relating to off-duty

employment and the Code of Ethics for Public Officers and Employees, Deputies

Thaeter and Moran participated in the internal administrative process in response

to the allegations against them. Each deputy, represented by counsel, had a pre-

disciplinary determination meeting, conducted by Captain Michael E. Gauger. On

April 13, 2001, Captain Gauger issued a Discipline Notification to both deputies

and recommended that they be terminated from employment with the PBCSO.[3] On

---

[3] In pertinent part, Captain Gauger's Discipline Notification explains his reasons for recommending the deputies' terminations:

> The supervisor of the Office of Professional Regulation under Sheriff Robert Neumann, Frank Demario and the supervisor of the Internal Affair's Division, Lieutenant Ann Burke both sustained two areas of violation. The first was the Violation of Section IX (16) Off Duty Employment. The policy of the Palm Beach County Sheriff's Office requires deputies to obtain prior written approval from the Sheriff, using the approved request form, before engaging in other employment, occupation, profession or commercial enterprise. Your decision to engage in the business of your wife, becoming an active participant in the display of intimate, sexual behavior for remuneration, does violate Sheriff's Office policy.
>
> The second violation sustained against you describes Section IX (59) Code of Ethics for Public Officers and Employees. This section mandates that public officers strictly adhere to the Code of Ethics and Canon of Law Enforcement Ethics. Again, your decision to engage in off-duty conduct that is construed by society to be pornographic of[] nature and to be viewed only by adults, for remuneration violates the Code of Ethics when the Code states, "I will keep my private life unsullied as an example to all". The attempt to disguise your identity fosters the image that you realized the behavior was inappropriate and took steps to conceal your involvement.
>
> Your law enforcement work has been exceptional, but your decision to engage in the web site activity is conduct that cannot be condoned by our Department. I am recommending that your employment with the Palm Beach Sheriff's Office be terminated.

Folder 1, Exh. G at 1-2 (emphasis added).

12

the first page of the Discipline Notification, Sheriff Bieluch wrote "I concur" and signed his name; the Under Sheriff wrote "Strongly concur!" Folder I, Exh. G. Thereafter, Lieutenant Ann Burke notified each deputy that he was terminated effective April 23, 2001.

Upon receiving their respective terminations, both deputies appealed their terminations as disciplinary actions to the Hearing Review Board, conducted by Captain Terrence Rowe. Commissioner James T. Moore of the Criminal Justice Professionalism Program, by letter, notified Sheriff Bieluch that the Criminal Justice Standards and Training Commission, an independent regulatory commission, had no basis to pursue any action against either deputy, although that decision did not reflect upon the "investigation, findings, conclusions, and/or disciplinary action" of the PBCSO.[4] Folder 1, Exh. L. Through counsel, the deputies challenged the regulations under which they were terminated. Specifically, they argued that the requirement that a deputy must lead an unsullied

---

[4] In relevant part, Commissioner Moore explained:

> This decision is based upon the finding that insufficient grounds exist under the guidelines of Chapter 943.1395, Florida Statutes, to pursue any disciplinary action by the Commission. The misconduct is considered a violation of agency policy as evidence is lacking to classify the misconduct as a violation of law or any moral character violation as defined under Rule 11B-27.0011(4), Florida Administrative Code.

Folder 1, Exh. L.

life was both void for vagueness and overbroad, impinging on constitutional rights of freedom of speech and expression as well as privacy.

The Hearing Review Board determined "that the matter was not sustained due to a policy failure as to the violation of the code of ethics" and that "there was no violation in regards to outside employment." Folder 1, Exh. N. Nonetheless, Sheriff Bieluch wrote on the bottom of the decision: "I do not concur with the board's findings. The original charge and discipline stands." Id. In an attached memorandum, Sheriff Bieluch explained his reasons for disagreeing with the Hearing Review Board and directed that his memorandum be provided to each member of a Termination Review Board if the deputies pursued administrative review of their terminations:

> The former deputies, Timothy Moran, Ronald Thaeter, and Jack Maxwell, III admitted to participating in the web site. This was done for economic gain, thus it is a job or business venture, which requires approval from each employee's respective chain of command prior to engaging in outside employment. Reversal of the finding regarding that portion of the sustained Internal Affairs investigation simply makes no sense. They needed the permission of the Sheriff's Office supervisors, and they did not have it. It is obvious that they violated this rule. **I reject the board's 5 to 0 vote to overturn that sustained finding.**

> The board cited Policy Failure as the reason for voting 4 to 1 in reversing the sustained Code of Ethics violation, and my decision to terminate the aforementioned employees. Had the board called Lieutenant Ann Burke to answer why she overturned the initial findings of Investigator Kronsperger, and had the members reviewed

14

SOP 222.03 IV [E,] they would have known that policy failure did not occur, and did not apply. That SOP states: *"Policy Failure-The policy or procedure does not properly address the allegation. Confusion, or conflict in policy led to the alleged conduct."*

The actions of pornographic activity <u>would</u> best be addressed by the Code of Ethics. <u>Certainly, the Code of Ethics is not so confusing that it would lead the former deputies to engage in pornographic acts</u>. Those are the elements necessary to cite Policy Failure. Those elements are not present. **I reject the board's 4 to 1 vote to overturn that sustained finding.**

In conclusion, <u>the pornographic activity was not restricted to the privacy of the former deputies' homes.</u> Instead, <u>it was on the Internet, which is accessible by the public</u>. When an allegation of misconduct is presented to the Sheriff's Office, it is mandated by policy and statute that an investigation be conducted. The public, if not already aware, then becomes aware of the incident because of the Public Records Law in Florida. It is my stated belief that <u>pornographic activity by deputies is something which would cause embarrassment to other officers, to the Sheriff's Office itself, which is the premiere law enforcement agency in Palm Beach County</u>, as well as <u>to me personally and professionally</u> as the Sheriff.

Whether the Florida Department of Law Enforcement seeks to have a Probable Cause Hearing is irrelevant. Internal Affairs investigations are based on a preponderance of evidence, and I believe that the preponderance requirement has been met.

The Hearing Review Board's determinations are rejected in whole. The terminations of former Deputies Moran, and Thaeter will stand.

Folder 1, Exh. O at 1-2 (first, second, fifth, seventh, and eighth emphases added).

Pursuant to standard operating procedure, Deputies Thaeter and Moran

requested that the Hearing Review Board convene a Termination Review Board to

review the Sheriff's overruling the decision of the Hearing Review Board regarding their terminations. In a letter to the chairman of the Termination Review Board, counsel for Deputies Thaeter and Moran pursued her arguments that the Police Officer Code of Ethics requirement that an officer must keep his or her "private life unsullied as an example to all" was vague and that a police officer "cannot be disciplined for off-duty involvement in activity protected by the First Amendment." Folder 1, Exh. R at 1, 2. In a 3-2 decision, the Termination Review Board determined that Deputies Thaeter and Moran should be returned to work. Based on that decision, counsel for Deputies Thaeter and Moran then wrote Sheriff Bieluch to reinstate the deputies.[5]

When Sheriff Bieluch did not reinstate Deputies Thaeter and Moran, they subsequently filed individual complaints for preliminary and permanent injunctive relief and monetary damages in federal court against the PBCSO and Sheriff Bieluch, defendants-appellees. In seeking to be reinstated as deputies in good standing at the PBCSO, they raised various causes of action, including an action under 42 U.S.C. § 1983 that their rights of free speech and association protected under the United States and Florida Constitutions had been violated. The district

_____

[5] In the letter to Sheriff Bieluch, counsel noted that Deputy Thaeter did not "ha[ve] the opportunity to present his evidence to a review board, since after the board ruled that there was a policy failure, they did not convene his hearing." Folder 1, Exh. S at 2.

16

judge dismissed with prejudice the deputies' complaints for failure to state a claim for which relief could be granted. He specifically noted: "The plaintiffs in any event by their complaint[s] do not deny their participation in the sexually explicit photographs and video tapes in question, which are described in narrative form in Kronsberger's final investigative report (as derived from taped interviews with the three officers in question), but rather, challenge the authority of the Sheriff to terminate their employment, consistent with First Amendment precepts, based upon that activity." R1-36 at 2 n.1 (Thaeter case); R1-34 at 2 n.1 (Moran case). This appeal followed in which the deputies argue that the district judge erred in dismissing their complaints under Federal Rule of Civil Procedure 12(b)(6) by concluding that the non-verbal, off-duty sexual conduct of the deputies did not constitute protected expressive conduct under the First Amendment.[6]

## II. DISCUSSION

A. <u>Standard of Review</u>

Our review of a district court's dismissal for failure to state a claim under

---

[6] Concerning the PBCSO regulation and ethical code section that are involved in this case, the deputies also have raised on appeal constitutional vagueness and overbreadth challenges that they had presented to the district court. We address these contentions within our First Amendment analysis. Since the deputies' expressive sexual conduct involved the Internet, they raise on appeal the issue of violation of the Commerce Clause, which was not addressed by the district judge. Because we have "'repeatedly held that "an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court,"'" we do not analyze this issue. <u>Access Now, Inc. v. Southwest Airlines Co.</u>, 385 F.3d 1324, 1331 (11th Cir. 2004) (collecting cases) (citations omitted).

Rule 12(b)(6) is <u>de novo</u>.  <u>Behrens v. Regier</u>, 422 F.3d 1255, 1259 (11th Cir. 2005).  "When considering a motion to dismiss, all facts set forth in the plaintiff's complaint 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.'"[7] <u>Grossman v. Nationsbank, N.A.</u>, 225 F.3d 1228, 1231 (11th Cir. 2000) (per curiam) (citation omitted).  A complaint may not be dismissed for failure to state a claim under Rule 12(b)(6) "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" <u>Magluta v. Samples</u>, 256 F.3d 1282, 1283-84 (11th Cir. 2001) (per curiam) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957)).

B. <u>Off-Duty Employment</u>

Deputies Thaeter and Moran contend that their off-duty participation in explicitly sexual or pornographic pictures and videos offered for pay over the Internet for which they were compensated was protected speech under the First and Fourteenth Amendments that could not constitute the basis for their

---

[7] Like the district court, "the facts recited are drawn from the allegations of the plaintiffs' complaints and attached exhibits, including the final investigative report of Investigator Kronsperger which the Complaint incorporates by reference."  R1-36 at 2 n.1 (Thaeter case); R1-34 at 2 n.1 (Moran case); <u>see</u> Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes," which necessarily includes Rule 12(b)(6) motions.) .

terminations.[8]  These deputy sheriffs, however, were subject to rules and

---

[8] "The First Amendment affords protection to expressive conduct as well as to actual speech."  Virginia v. Black, 538 U.S. 343, 358, 123 S.Ct. 1536, 1547 (2003).  The speech involved in this case is expressive conduct, the alleged First Amendment right of Deputies Thaeter and Moran to participate off-duty in pornographic pictures and videos available for viewing on the Internet for a fee.  The Supreme Court has upheld the distribution of sexually explicit films consistent with the First Amendment.  See, e.g., Schad v. Borough of Mount Ephraim, 452 U.S. 61, 101 S.Ct. 2176 (1981); Erznoznik v. City of Jacksonville, 422 U.S. 205, 95 S.Ct. 2268 (1975); Times Film Corp. v. City of Chicago, 365 U.S. 43, 81 S.Ct. 391 (1961).  The Court, however, also has upheld government or police-power statutes that regulate erotic performers in their expressive conduct.  See Barnes v. Glen Theatre, Inc., 501 U.S. 560, 566, 111 S.Ct. 2456, 2460 (1991) (recognizing that, while nude dancing "is expressive conduct within the outer perimeters of the First Amendment," albeit "only marginally so," the Court held that state public indecency statute that required dancers in a lounge and adult bookstore to wear pasties and G-strings did not violate the First Amendment).  "Conduct or depictions of conduct that the state police power can prohibit on a public street do not become automatically protected by the Constitution merely because conduct is moved to a bar or a 'live' theater stage, any more than a 'live' performance of a man and woman locked in a sexual embrace at high noon in Times Square is protected by the Constitution because they simultaneously engage in a valid political dialogue."  Paris Adult Theatre I v. Slaton, 413 U.S. 49, 67, 93 S.Ct. 2628, 2640 (1973); see also Arcara v. Cloud Books, Inc., 478 U.S. 697, 705, 106 S.Ct. 3172, 3176 (1986) (upholding the closing of an adult bookstore that had become a site for solicitation of prostitution, public acts of masturbation, fondling, and fellatio by patrons, the Court recognized that "First Amendment values may not be invoked by merely linking the works 'sex' and 'books'").  Rather than the seemingly all-encompassing First Amendment protection that the deputies claim to cover photographs and videotapes of their off-duty sexually expressive conduct, the Court has clarified "that the First Amendment does not guarantee the right to [engage in protected expression] at all times and places and in any manner that may be desired."  Heffron v. International Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 647, 101 S.Ct. 2559, 2564 (1981).  Consequently, the case law in this area instructs that we must be careful not to equate the public display of all non-obscene nudity with protected expression.

To the extent that the deputies allege violations of their constitutional associational and privacy rights, the First Amendment is not a panacea.  "It is possible to find some kernel of expression in almost every activity a person undertakes . . . but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."  City of Dallas v. Stanglin, 490 U.S. 19, 25, 109 S.Ct. 1591, 1595 (1989).  The Fifth Circuit has distinguished between nude dancing and intentional touching between a nude dancer and a bar patron: "That the physical contact occurs while in the course of protected activity does not bring it within the scope of the First Amendment."  Hang On, Inc. v. City of Arlington, 65 F.3d 1248, 1253 (5th Cir. 1995).  In upholding a local ordinance that prohibited nude sunbathing, we recognized "that '[n]udity is protected speech only when combined with some mode of expression which itself is entitled to first amendment protection.'"  South Florida Free Beaches, Inc. v. City of Miami, Fla., 734 F.2d 608, 610 (11th Cir. 1984) (citation omitted) (alteration in original).  "Stripped of constitutional

19

protection, nude sunbathing is subject to legitimate governmental proscriptions," and we concluded that the plaintiffs did not "possess a constitutional right of associating in the nude." Id.

The Fourth Circuit determined that First Amendment privacy protection was lost when a husband and wife brought others into their home to view or to participate with them in erotic sexual experiences, which were photographed, in violation of state sodomy laws.  Lovisi v. Slayton, 539 F.2d 349 (4th Cir. 1976).  Concluding that the husband and wife had relinquished their federal constitutional right to privacy by engaging in intimate sexual conduct with or in the presence of others, that court explained:

> What the federal constitution protects is the right of privacy in circumstances in which it may reasonably be expected.  Once a married couple admits strangers as onlookers, federal protection of privacy dissolves.  It matters not whether the audience is composed of one, fifty, or one hundred, or whether the onlookers pay for their titilation.  If the couple performs sexual acts for the excitation or gratification of welcome onlookers, they cannot selectively claim that the state is an intruder.  They possess the freedom to follow their own inclinations in privacy, but once they accept onlookers, whether they are close friends, chance acquaintances, observed "peeping Toms" or paying customers, they may not exclude the state as a constitutionally forbidden intruder.
> The answer to the question when the right of privacy is lost cannot turn upon numbers, preserved, if there is one onlooker or two, but not if there are three, or preserved if there are ten, but not if there are eleven.  Nor should it turn upon the fact that the onlookers, however many, are not only passive observers but are participants themselves in sexual activity, some of it with one or more of the partners to the marriage.  In either such event, the married couple has welcomed a stranger to the marital bedchamber, and what they do is no longer in the privacy of their marriage.

Id.  (emphasis added).  This reasoning would be applicable to the sexual conduct of the deputies with their spouses and others that occurred in this case.  While the intimate sexual conduct between the deputies and their spouses would have been entitled to First Amendment protection if it had occurred in the privacy of their homes, that shield of constitutional privacy protection was lost when these intimate marital relations included the participation of others in a hotel room, where it was photographed, videotaped, and moved to the Internet for public viewing for pay, and the deputies were compensated for their sexual performances.

Despite the deputies apparent argument that the protection for First Amendment expressive conduct is unlimited, this protection is not without limitations.  Nonetheless, the constitutional protection afforded pornographic films or videos and expressive conduct is not what is at issue in this case.  Rather, we must analyze the off-duty participation of Deputies Thaeter and Moran in pornographic pictures and videos available on the Internet for pay and for which they were compensated in the specialized context of their government employment and the rules and regulations that governed that employment, even when they were off-duty.

20

regulation of the PBCSO required them to "obtain prior written approval from the Sheriff using the approved request form, before engaging in other employment, occupation, profession or commercial enterprise." Folder I, Exh. A at 13 (IX(16) Off-Duty Employment, Rules and Regulations of the PBCSO) (emphasis added). Additionally, the PBCSO required its employees to adhere to its adopted Code of Ethics, which mandated that employees must keep their private lives "unsullied as an example to all." Folder I, Exh. A at 12. The obvious purpose of the prior-approval regulation was to prevent damage to public confidence in the PBCSO by employees' off-duty employment, and the ethical rule similarly required employees to conduct their private or off-duty lives so as not to place the PBCSO in disregard.

There is no dispute that Deputies Thaeter and Moran did not seek or obtain prior written approval from Sheriff Bieluch before their off-duty participation in the pornographic pictures and videos for compensation. Although "[a] government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment," nonetheless "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general

21

public."[9]  City of San Diego v. Roe, 543 U.S. 77, 80, 125 S.Ct. 521, 523 (2004) (per curiam); see Brown v. Glines, 444 U.S. 348, 356 n.13, 100 S.Ct. 594, 600 n.13 (1980) ("Even when not confronted with the special requirements of the military, we have held that a government employer may subject its employees to such special restrictions on free expression as are reasonably necessary to promote effective government." (collecting cases)); Kelley v. Johnson, 425 U.S. 238, 247-48, 96 S.Ct. 1440, 1445-46 (1976) (upholding hair-length regulation of police

---

[9] Regulations and ethical codes, such as those we review in this case, are not uncommon among local law enforcement offices.  For example, the Tenth Circuit reviewed similar regulations and ethical rules for the Colorado Springs Police Department and determined them not to be facially vague:

 C 1300.  STANDARDS OF CONDUCT—GENERAL RULES:
Members of a Police Department are highly visible representatives of government and are entrusted with the responsibility of ensuring the safety and well-being of the community as well as the delivery of police services.  Since the functions of a Police Department have a major impact upon the community, standards of conduct for police personnel are higher than standards applied to the general public.  In this regard Department Members will conduct themselves in a manner which does not bring discredit upon individuals, the Department, the City of Colorado Springs or the community.

C 1301.25.  CONDUCT UNBECOMING A POLICE OFFICER:
Members of the Colorado Springs Police Department shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Department.  Conduct unbecoming a police officer shall include that which brings the Department into disrepute or reflects discredit upon the officer as a Member of the Department, or that which impairs the operation or efficiency of the Department or Member.

Flanagan v. Munger, 890 F.2d 1557, 1569 nn. 12 & 13 (10th Cir. 1989) (emphasis added).

22

department against a First and Fourteenth Amendment challenge).[10]  When an employee violates a specific rule or regulation to which he or she is subject, the government employer's position is strengthened.   Connick v. Myers, 461 U.S. 138, 153 n.14, 103 S.Ct. 1684, 1693 n.14 (1983) (citing Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 284, 97 S.Ct. 568, 574 (1977)).

Significantly, the rule requiring prior written approval before engaging in off-duty employment is not obtuse or ambiguous.  See Colten v. Kentucky, 407 U.S. 104, 110, 92 S.Ct. 1953, 1957 (1972) (explaining that a rule should comport with a "rough idea of fairness . . . . and [be] sufficiently specific to provide fair warning that certain kinds of conduct are prohibited").  "The rule is easily understood by persons of ordinary intelligence." Zook v. Brown, 865 F.2d 887, 892 (7th Cir. 1989) (concerning failure of deputy sheriff to obtain prepublication review from the sheriff before submitting a letter for publication in a local newspaper); see Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127 (1926) (determining that a regulation is facially vague when it "either forbids or requires the doing of an act in terms so vague that men of common intelligence

---

[10] Commenting on the effect of Kelley as supporting the special need for law enforcement to regulate the conduct of its employees, the Ninth Circuit recognized: "In the wake of that decision, other courts have noted that the state's interest in regulating the conduct of its employees is perhaps at its greatest where paramilitary organizations, such as a police force, are involved." Thorne v. City of El Segundo, 726 F.2d 459, 470 n.10 (9th Cir. 1983) (emphasis added).

23

must necessarily guess at its meaning and differ as to its application"). Therefore, failure to comply with the rule requiring prior written approval from Sheriff Bieluch before engaging in any off-duty employment evidences deliberate disregard for this rule governing the employment of Deputies Thaeter and Moran. Their knowledge of this rule is further shown by the deputies' attempts to conceal their identities in the pornographic videos in which they participated, demonstrating their realization that this off-duty conduct was done in contravention of the rules governing their PBCSO employment and the termination of the two websites that featured the wives of Deputies Thaeter and Moran, when the deputies received notice of the internal investigation.

In the particularized context of government employees exercising their First Amendment rights, the Supreme Court confirmed in <u>Roe</u> that the appropriate analysis is the balancing test established in <u>Pickering v. Board of Education of Township High School District 205</u>, 391 U.S. 563, 88 S.Ct. 1731 (1968), and clarified by <u>Connick</u>.[11] 543 U.S. at 82, 125 S.Ct. at 524-25. This test requires balancing the speech by the government employee with the "proper functioning of government offices," which cannot be compromised.[12] <u>Roe</u>, 543 U.S. at 82, 125

---

[11] We note that the Supreme Court confirmed and clarified <u>Pickering</u> and <u>Connick</u> rather than creating new law in <u>Roe</u>.

[12] In his memorandum to the Chairman of the Hearing Review Board, Sheriff Bieluch explained his reasons for overruling the decision of the Hearing Review Board and upholding the

S.Ct. at 525. <u>Roe</u> concerned a police officer who off-duty made a sexually explicit video of himself masturbating, which he sold over the Internet on the adults-only section of eBay. Following an investigation, the police officer was terminated for violating specific police department policies, "including conduct unbecoming of an officer, outside employment, and immoral conduct."[13] <u>Id.</u> at 79, 125 S.Ct. at 523; <u>see</u> <u>Pena v. Deprisco</u>, 432 F.3d 98, 111 (2d Cir. 2005) ("[T]he fact that an officer is off-duty does not prevent him or her from giving assurances

terminations of Deputies Thaeter and Moran: "It is my stated belief that pornographic activity by deputies is something that would cause embarrassment to other officers, to the Sheriff's Office itself, which is the premiere law enforcement agency in Palm Beach County, as well as <u>to me personally and professionally</u> as the Sheriff." Folder I, Exh. O at 2.

[13] In concluding that such ethical standards as "conduct unbecoming an officer" are not vague, the Tenth Circuit explained:

> "While it is true that this rule is not precise in delineating proscribed conduct or in positing a standard by which a police officer can evaluate the propriety of proposed conduct, broad rules such as ones condemning 'conduct unbecoming an officer' or, as here, conduct impairing the operation or efficiency of the department or bringing the department into disrepute, have been generally upheld against challenges of facial vagueness . . . .
> Capacious phrases such as the one included in the Colorado Springs Manual are unavoidable. They nevertheless provide adequate notice to police officers that their conduct, <u>both on and off duty</u>, must meet a high standard of comportment . . . .
> As Judge Leventhal of the District of Columbia Circuit noted in <u>Meehan v. Macy</u>, 392 F.2d 822, 835 (D.C. Cir. 1968), <u>modified</u>, 425 F.2d 469, <u>aff'd</u>, 425 F.2d 472 (1969):
> '[I]t is not feasible or necessary for the Government to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees includes 'catchall' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.'"

<u>Flanagan</u>, 890 F.2d at 1569-70 (quoting <u>Puzick v. City of Colorado Springs</u>, 680 P.2d 1283, 1286 (Colo. App. 1983)) (emphasis added).

25

about what he or she or other police officers will or will not do when acting as police officers."). In upholding the terminations of Deputies Thaeter and Moran against the contrary decision of the Hearing Review Board, Sheriff Bieluch stated: "Certainly, the Code of Ethics is not so confusing that it would lead the former deputies to engage in pornographic acts." Folder I, Exh. O at 2. The Roe Court clarified that Connick augmented Pickering by making "the threshold test" for engaging in the Pickering balancing analysis a determination of whether the government employee's speech involved a matter of "public concern," defined as "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." 543 U.S. at 83-84, 125 S.Ct. at 525-526.

Similar to the pornographic conduct of the police officer in Roe, the paid participation of Deputies Thaeter and Moran in pornographic photographing and videotaping for Internet display for a fee "does not qualify as a matter of public concern under any view of the public concern test." Id. at 84, 125 S.Ct. at 526. Additionally, despite their attempts to disguise themselves while engaging in sexually explicit conduct, the deputies' expressive speech and the fact that they were recognized as deputy sheriffs with the PBCSO by paying Internet voyeurs "was detrimental to the mission and functions of the employer"; it reflected on

26

their fitness as deputies and undermined public confidence in the PBCSO. Id.

Therefore, the Pickering balancing test is not applicable to the subject sexually

expressive conduct of Deputies Thaeter and Moran, because their participation in

pornographic photographs and videos for pay is within "the context of restrictions

by governmental entities on the speech of their employees." Id. at 85, 125 S.Ct. at

526. The district judge properly dismissed the respective cases of the deputies.[14]

### III. CONCLUSION

In this consolidated appeal from the granting of PBCSO and Sheriff

Bieluch's motion to dismiss, Deputies Thaeter and Moran maintain that their First

Amendment rights were violated when they were terminated for participating for

compensation in sexually explicit photographs and videos available for paid

viewing on the Internet. As we have explained, the deputies not only violated the

regulation requiring prior approval from Sheriff Bieluch before engaging in off-

duty employment, but also their expressive conduct does not qualify for the

Pickering balancing test because it does not involve a matter of public concern

and could affect the efficiency and reputation of the Sheriff's Office regarding the

---

[14] Since we have concluded that Deputies Thaeter and Moran do not have a legal basis for their allegations of violation of their First and Fourteenth Amendment rights by the PBCSO because of the necessary constraints government employment places on the First Amendment rights of employees, we need not address other related issues that the deputies have raised on appeal.

public. On the facts of this case, there is no legal basis for this case to proceed. Accordingly, the district judge's granting defendants-appellees's motion to dismiss is **AFFIRMED**.