# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RONALD DIBLE; MEGAN DIBLE,
husband and wife,
        *Plaintiffs-Appellants,*

v.

CITY OF CHANDLER, a municipality
in the State of Arizona; CHANDLER
POLICE DEPARTMENT, a law
enforcement agency of the City of
Chandler; BOBBY JOE HARRIS,
Chandler Police Chief and
husband; JUDY HARRIS, wife,
        *Defendants-Appellees.*

No. 05-16577

D.C. No.
CV-03-00249-JAT

ORDER
AMENDING
OPINION AND
CONCURRING
OPINION AND
DENYING
APPELLANT'S
PETITION FOR
REHEARING AND
FOR REHEARING
EN BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

Argued and Submitted
June 11, 2007—San Francisco, California

Filed September 5, 2007
Amended February 1, 2008

Before: Mary M. Schroeder, William C. Canby, Jr., and
Ferdinand F. Fernandez, Circuit Judges.

Opinion by Judge Fernandez;
Concurrence by Judge Canby

1629

**COUNSEL**

Keith M. Knowlton, Keith M. Knowlton, L.L.C., Mesa, Arizona, for the plaintiffs-appellants.

Katherine E. Baker, Green & Baker, Scottsdale, Arizona, for the defendants-appellees.

**ORDER**

The opinion which appears at slip op. 11501 (9th Cir. Sept. 5, 2007) is amended as follows:

(1)   The first full paragraph at slip op. 11506 is hereby revoked and the following is substituted in its place:

> Ronald Dible believed, indeed most likely knew, that his position in the disreputable sexually explicit website business was not compatible with his position as a police officer and risked violating the City and Police Department rule against engaging "in conduct which might bring discredit to the City service." So he took steps to cover up his participation, and in so doing violated the rule that he could not engage in outside employment unless he first filled out and filed a request to engage in employment outside the department. He did not inform any Department officials about it.1 He did, however, tell a few people about it, including a fellow police officer, whom he urged to start his own website. The officer eventually did.

(2)   The first full paragraph at slip op. 11511 is revoked and the following is substituted in its place:

Of course, as the Court noted, Roe had gone out of his way to identify himself with police work. *See id.* at 81, 125 S. Ct. at 524. Perhaps that alone would have sufficed to make his activity related to his employment. If that were the case, it must be said that Ronald Dible did not do what Roe did. Ronald Dible took some pains to keep the police out of the pictures, but because of other clues and information, it became publicly known that he was involved and that he was a police officer. In any event, Ronald Dible's attempts to conceal his activity came to nought and do not distinguish the underlying situation in *Roe*. Many a rule breaker does so clandestinely in the hope that his violations will not come to light and have untoward consequences. When that hope is dashed, the results and consequences for him are the same as they would have been if he had broken the rules overtly. Roe overtly broke his employer's rules (outside employment and immoral conduct) and he properly suffered the consequences by losing his job. Ronald Dible's discovered clandestine activity also broke his employer's rules (outside employment and conduct that brought disrepute) and he properly suffered the consequences by losing his job. In addition, it can be seriously asked whether a police officer can ever disassociate himself from his powerful public position sufficiently to make his speech (and other activities) entirely unrelated to that position in the eyes of the public and his superiors. Whether overt or temporarily hidden, Ronald Dible's activity had the same practical effect — it "brought the mission of the employer and the professionalism of its officers into serious disrepute." *Id.* at 81, 125 S. Ct. at 524.

That said, the Court has never explicitly defined what is or is not related, and we need not do so here. As in *Roe*, the result would be the same "under either line of cases." *Id.* at 80, 125 S. Ct. at 524. The Dibles cannot prevail. We will explain.

(3)   The concurring opinion is amended as follows: Footnote 2 at slip op. 11527 is amended to add the word "of" after the phrase "In light."

With the above amendments, the panel has voted unanimously to deny the petition for rehearing. The petition for rehearing en banc was circulated to the judges of the court, and no judge requested a vote for en banc consideration.

The petition for rehearing and the petition for rehearing en banc are DENIED.

No subsequent petition for rehearing or rehearing en banc may be filed.

---

## OPINION

FERNANDEZ, Circuit Judge:

Ronald and Megan Dible appeal from the district court's grant of summary judgment against them in their action against the City of Chandler, Arizona, the Chandler Police Department, and the Chandler Police Chief Bobby Joe Harris (collectively the City). Principally, the Dibles assert that Ronald Dible was a police officer whose rights under the First Amendment to the United States Constitution were violated when he was terminated for participating in (performing in, recording and purveying) a sexually explicit website with his wife. We affirm.

## BACKGROUND

In January of 2002, the Chandler Police Department learned that one of its officers, Ronald Dible, was running a website featuring sexually explicit photographs and videos of his wife. After initially placing Ronald Dible on administrative leave and conducting an internal investigation into his involvement with the website, the City terminated his employment as a police officer.

Ronald Dible and his wife Megan Dible began running the website in September of 2000, after Megan Dible signed a contract with CDM Networks, which operated the website. The Dibles then posted pictures of Megan Dible on the website, under the pseudonym "Katelynn." Those photographs portrayed Megan Dible in various sexual poses and activities with Ronald Dible, another woman, and inanimate objects. The Dibles also posted, among other things, a videotape of Megan Dible masturbating that had been filmed by Ronald Dible. The Dibles did not intend to express any kind of message or engage in social or political commentary through the material they posted on their website. They participated in those activities to make money; it was as simple as that.

The website operated as follows: Any computer user with internet capability could access the website's home page without charge. The home page featured partially nude pictures of Megan Dible in order to entice customers. If the user wanted to view more pictures of Megan Dible, a fee was required, but before the pictures could be reviewed, the user had to enter into a purported contract with CDM Networks. Once the user accepted the terms of the contract and paid the fee, he was free to view the website's sexually explicit photographs and videos.

The Dibles also offered a CD-ROM for sale on the website. Like the website itself, the CD-ROM featured photographs of Megan Dible having sex with Ronald Dible, other women,

and inanimate objects. Although the photographs on the website and the CD-ROM generally did not show Ronald Dible's face, one of the photographs did.

The Dibles also promoted their website by attending "bar-meets." The purpose of the bar-meets was to have fans of the website meet Megan Dible, although Ronald Dible also attended. The bar-meets, which took place at local bars, were open to the public, and attendees were free to take photographs. They did, and sometimes posted those on their own websites. Although some attendees knew Megan Dible only as Katelynn, others knew her true identity. At those bar-meets, both Megan Dible and Ronald Dible posed in sexually suggestive ways with each other and with other people, some of whom were partially nude. The Dibles' photographs from the bar-meets were compiled on a CD-ROM and were then sold through their website.

Ronald Dible believed, indeed most likely knew, that his position in the disreputable sexually explicit website business was not compatible with his position as a police officer and risked violating the City and Police Department rule against engaging "in conduct which might bring discredit to the City service." So he took steps to cover up his participation, and in so doing violated the rule that he could not engage in outside employment unless he first filled out and filed a request to engage in employment outside the department. He did not inform any Department officials about it.[1] He did, however, tell a few people about it, including a fellow police officer, whom he urged to start his own website. The officer eventually did.

Sometime in the later part of 2001, rumors about the Dibles' website began circulating among members of the department, and eventually the news of the website filtered up

---

[1]In fact, he lied about his participation when police department people asked.

to department officials. Upon learning about it, the police chief on January 25, 2002, ordered Ronald Dible to cease all activity with the website and placed him on administrative leave. The chief then opened an investigation into Ronald Dible's involvement with the website. The investigators questioned Ronald Dible about it, and, in response, he provided several misleading answers. After establishing that he was, in fact, involved in the website, the investigators questioned him about, among other things, whether he and Megan Dible had earned money from the site, and asked to see the contract between Megan Dible and CDM Networks.

By January 25, 2002, the press had also learned about the website and began reporting on it in an unflattering manner. The press reported that the website was run by the Dibles and that he was employed as a city police officer. The record contains no evidence identifying the person who alerted the press to the website's existence or to the Dibles' involvement in it, but, of course, a lot of people already knew. The result of that publicity was disquieting to say the least. A police lieutenant assigned to look into the situation spoke to a large number of officers and others, found that it had severely impacted their working situation, and declared that police officer morale "really hit bottom."

In due course, Ronald Dible's supervisor recommended his dismissal. The supervisor found that Ronald Dible had violated the department's regulation prohibiting its officers from bringing discredit to the city service, and that Ronald Dible had provided false answers to district investigators in the course of their investigation. Chief Harris approved Ronald Dible's dismissal.

Ronald Dible then appealed that decision to the City's Merit Board, which conducted an evidentiary hearing. At the hearing, several officers testified that they had been questioned and ridiculed about the website. A female officer, Amy Hedges, testified that she was called a "porn whore" by an

individual she was attempting to arrest. She further testified that she was subjected to derogatory remarks while responding to a bar fight. Specifically, when she arrived at the bar, a patron began gyrating, told her to take off her clothes, and harassed her about the website. Officer Hedges testified that the patron's comments added to the instability of an already fluid field situation and confrontation. Another officer testified to the disrespect that he was shown after the website became publicly known. An investigating officer, who had interviewed many other officers, as well as other people, also testified to the impact of the Dibles' activity on the department. In addition, potential police recruits questioned an officer about the website on each of the five separate recruitment trips that she had conducted after the existence of the site became widely known to members of the public. Assistant Chief Joseph Gaylord testified that he believed the scandal involving Ronald Dible's participation in the sexually explicit website would negatively impact the department's efforts to recruit female officers for years to come. Ultimately, on April 3, 2002, the Merits Board issued a recommendation affirming the decision to discharge Ronald Dible.

Thereafter, the Dibles initiated the underlying action.[2] The district court granted summary judgment in the City's favor on each of the Dibles' claims. In its order, the district court found that, among other things, Ronald Dible's involvement in the website was not protected by the First Amendment. Subsequently, the Dibles' counsel, Keith Knowlton, filed a motion for a new trial and filed a supplement thereto. The district court denied the motions. This appeal ensued.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C.

---

[2]Although the Dibles filed their action in state court, the case was later removed to federal district court.

§§ 1331, 1343, 1367. We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review the district court's grant of the summary judgment de novo. *Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004).

## DISCUSSION

The major issue before us is whether Ronald Dible's First Amendment right to freedom of speech[3] was violated when he was terminated for maintaining and participating in a sexually explicit website with his wife, Megan Dible. In fact, for all practical purposes, the other issues in this case hinge on the decision of that issue. We will, therefore, consider it first and consider the other issues raised by the Dibles thereafter.

### A.   *Freedom of Speech*

The Dibles claim that because Ronald Dible's activities must be treated as protected employee speech, the City improperly terminated him. *See Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (setting forth elements of a prima facie case). We disagree.

The Supreme Court recently took up the issue of employee speech in general and conduct of the sort engaged in by Ronald Dible in particular. *See City of San Diego v. Roe*, 543 U.S. 77, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004) (per curiam). In that case, a police officer with the City of San Diego, California, made a video of "himself stripping off a police uniform and masturbating." *Id.* at 78, 125 S. Ct. at 522. He sold copies on eBay, under a user name of Codestud3@aol.com. *Id.* While it appears that the uniform was not the specific uniform

---

[3]We recognize that the Dibles' conduct was more expression (nudity and sexual activity) than speech as such. That does not change the analysis.

worn by San Diego police officers, it was "clearly identifiable as a police uniform," and Roe also sold custom videos and official "uniforms of the San Diego Police Department," along with other items of police equipment. *Id.* "Roe's eBay user profile identified him as employed in the field of law enforcement." *Id.* at 78, 125 S. Ct. at 523. When the police department found out, it investigated and ultimately terminated him. *Id.* at 78-79, 125 S. Ct. at 523. He then brought an action in which he claimed that his First Amendment right to freedom of speech had been violated. *Id.* at 79, 125 S. Ct. at 523.

The Supreme Court surveyed First Amendment law as it related to government employees, and set forth an analytical framework for consideration of the issue. The Court first recognized that "[a] government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment." *Id.* at 80, 125 S. Ct. at 523. That said, when a government employee's speech is under consideration, there are two paths of analysis, depending on whether the speech is related or unrelated to the person's employment. As the Court put it:

> [A] governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public. The Court has recognized the right of employees to speak on matters of public concern, typically matters concerning government policies that are of interest to the public at large, a subject on which public employees are uniquely qualified to comment. *See* [*Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)]; *Pickering v. Bd. of Ed. of Township High School Dist. 205, Will County*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). Outside of this category, the Court has held that when government employees speak or write on their own time on topics unrelated to their

employment, the speech can have First Amendment protection, absent some governmental justification "far stronger than mere speculation" in regulating it. *United States v. Treasury Employees*, 513 U.S. 454, 465, 475, 115 S. Ct. 1003, 130 L. Ed. 2d 964 (1995) (*NTEU*). We have little difficulty in concluding that the City was not barred from terminating Roe under either line of cases.

*Id.* at 80, 125 S. Ct. at 523-24.

The Court then went on to consider whether Roe's speech activities were related or unrelated to his position as a police officer with the city. It determined that Roe's indecent activity, indeed, related to his employment. *Id.* at 80-82, 125 S. Ct. at 524. In so doing, the Court observed that in *NTEU* the speech in question was not only unrelated but also "had no effect on the mission and purpose of the employer." *Id.* at 80, 125 S. Ct. at 524. The Court also emphasized that in *NTEU* "none of the speech at issue 'even arguably [had] any adverse impact' on the employer." *Id.* at 81, 125 S. Ct. at 524. It finally pointed out that the City of San Diego had conceded that Roe's activities were unrelated in the sense that they were not concerned with the "workings or functioning" of the police department, but, it concluded:

It is quite a different question whether the speech was detrimental to the SDPD. On that score the City's consistent position has been that the speech is contrary to its regulations and harmful to the proper functioning of the police force. The present case falls outside the protection afforded in *NTEU*. The authorities that instead control, and which are considered below, are this Court's decisions in *Pickering*, *supra*, *Connick*, 461 U.S. 138, 103 S. Ct. 1684, and the decisions which follow them.

*Id.* at 81-82, 125 S. Ct. at 524.

Of course, as the Court noted, Roe had gone out of his way to identify himself with police work. *See id.* at 81, 125 S. Ct. at 524. Perhaps that alone would have sufficed to make his activity related to his employment. If that were the case, it must be said that Ronald Dible did not do what Roe did. Ronald Dible took some pains to keep the police out of the pictures, but because of other clues and information, it became publicly known that he was involved and that he was a police officer. In any event, Ronald Dible's attempts to conceal his activity came to nought and do not distinguish the underlying situation in *Roe*. Many a rule breaker does so clandestinely in the hope that his violations will not come to light and have untoward consequences. When that hope is dashed, the results and consequences for him are the same as they would have been if he had broken the rules overtly. Roe overtly broke his employer's rules (outside employment and immoral conduct) and he properly suffered the consequences by losing his job. Ronald Dible's discovered clandestine activity also broke his employer's rules (outside employment and conduct that brought disrepute) and he properly suffered the consequences by losing his job. In addition, it can be seriously asked whether a police officer can ever disassociate himself from his powerful public position sufficiently to make his speech (and other activities) entirely unrelated to that position in the eyes of the public and his superiors. Whether overt or temporarily hidden, Ronald Dible's activity had the same practical effect — it "brought the mission of the employer and the professionalism of its officers into serious disrepute." *Id.* at 81, 125 S. Ct. at 524.

That said, the Court has never explicitly defined what is or is not related, and we need not do so here. As in *Roe*, the result would be the same "under either line of cases." *Id.* at 80, 125 S. Ct. at 524. The Dibles cannot prevail. We will explain.

**[1]** (1) *Related Speech*. If we determined that Ronald Dible's activities were related to his public employment, we

would necessarily approach his First Amendment claim as did the Supreme Court in *Roe*. It said:

> To reconcile the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission, the *Pickering* Court adopted a balancing test. It requires a court evaluating restraints on a public employee's speech to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

*Id.* at 82, 125 S. Ct. at 524-25. As the Court explained, before an employee is even entitled to have the balancing test applied, the "speech must touch on a matter of 'public concern.'" *Id.* at 82-83, 125 S. Ct. at 525. The Court further pointed out: "*Connick* held that a public employee's speech is entitled to *Pickering* balancing only when the employee speaks 'as a citizen upon matters of public concern' rather than 'as an employee upon matters only of personal interest.'" *Id.* at 83, 125 S. Ct. at 525. And, while the borders of the territory of public concern are not entirely defined, they do encompass matters that are "of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication," and even some private comments in the proper circumstances. *Id.* at 83-84, 125 S. Ct. at 525-26. So, for example, the Court has said that an employee's quiet statement to a fellow employee at a county constable's office that she hoped that a future attempt at assassination of the President would succeed, touched on a matter of public concern. *See Rankin v. McPherson*, 483 U.S. 378, 379-82, 386, 107 S. Ct. 2891, 2894-96, 2898, 97 L. Ed. 2d 315 (1987).

No matter. Whatever a periplus of the outer limits of public concern might show, it was pellucid that Roe's vulgar behav-

ior would be discovered to be outside of those borders. As the Court said, "there is no difficulty in concluding that Roe's expression does not qualify as a matter of public concern under any view of the public concern test. He fails the threshold test and *Pickering* balancing does not come into play." *Roe*, 543 U.S. at 84, 125 S. Ct. at 526.

**[2]** The same is true of Ronald Dible's activities in this case. They did not give the public any information about the operations, mission or function of the police department, and were not even close to the kind of private remarks that the Court has countenanced. His activities were simply vulgar and indecent. They did not contribute speech on a matter of public concern. The Dibles could not prevail if Ronald Dible's speech is deemed to have been related to his employment.

(2) *Unrelated Speech.* If we determined that Ronald Dible's activities were unrelated to his public employment, we would also have to apply a balancing test. Interestingly enough, it is not entirely clear whether the public concern concept would be a necessary threshold to that balancing. In *Roe*, *id.* at 80-82, 125 S. Ct. at 524, the Supreme Court did not exactly say that the public concern concept must be considered, but it also did not expressly hold that the Court of Appeals' determination that public concern was part of the test was incorrect.[4] And in *NTEU*, 513 U.S. at 466, 115 S. Ct. at 1013, the Court pointed out that:

> Respondents' expressive activities in this case fall within the protected category of citizen comment on matters of public concern rather than employee comment on matters related to personal status in the workplace. The speeches and articles for which they received compensation in the past were addressed to

---

[4] *See Roe v. City of San Diego*, 356 F.3d 1108, 1117-18 (9th Cir.), *rev'd*, 543 U.S. 77, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004) (per curiam).

a public audience, were made outside the workplace, and involved content largely unrelated to their government employment.

Moreover, in *Rankin*, 483 U.S. at 386, 107 S. Ct. at 2898, the Court did indicate that a comment about the President was a matter of public concern, but *Rankin* dealt with an unrelated comment made at the workplace itself. We, however, need not resolve whether the public concern test must be satisfied in this instance. *See Locurto v. Giuliani*, 447 F.3d 159, 175 (2d Cir. 2006).

If a statement must be one of public concern when it consists of unrelated activity away from the workplace, Ronald Dible's conduct was no more protected than it would be if the activity were related, and the Dibles' claim would fail on that account. But, suppose passing the public concern test is not required when unrelated expressive activity takes place away from the work setting. What then? Again, we must balance the asserted First Amendment right against the government's justification. *See Roe*, 543 U.S. at 80, 125 S. Ct. at 524. The Dibles' First Amendment claim cannot survive that balance either.

We first note that a number of Supreme Court justices have expressed some dubiety about the strength of the protection offered to activities that can be said to be of the same ilk as those we deal with here, or, perhaps, of an even less indecent ilk. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S. Ct. 1382, 1391, 146 L. Ed. 2d 265 (2000) (plurality opinion) (stating that public nude dancing is "only within the outer ambit of the First Amendment protection"); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565-66, 111 S. Ct. 2456, 2460, 115 L. Ed. 2d 504 (1991) (plurality opinion) (stating that public nude dancing is protected but "only marginally") However, this court has said that plurality decisions of the Supreme Court do not make law and that "the degree of protection the first amendment affords speech does not vary with

the social value ascribed to that speech by the courts." *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1058 (9th Cir. 1986). None of those cases is exactly like the one at hand. We are not dealing with the rights of an ordinary citizen vis-à-vis the government; we are dealing with the rights of a governmental employee (a police officer at that) vis-à-vis his employer. In this context, the reflections of the Justices about the weight of the right to engage in public indecent activity commend themselves to our consideration. As *Roe* suggests, it is a bit difficult to give that activity the same weight as the right to engage in political debate[5] or to lecture on religion and black history or to write articles about the environment.[6] Especially is that true where, as here, the employee admits that he was not interested in conveying any message whatsoever and was engaged in the indecent public activity solely for profit.

[3] In any event, the interest of the City in maintaining the effective and efficient operation of the police department is particularly strong. It would not seem to require an astute moral philosopher or a brilliant social scientist to discern the fact that Ronald Dible's activities, when known to the public, would be "detrimental to the mission and functions of the employer." *Roe*, 543 U.S. at 84, 125 S. Ct. at 526. And although the government's justification cannot be mere speculation, it is entitled to rely on "reasonable predictions of disruption." *Waters v. Churchill*, 511 U.S. 661, 673, 114 S. Ct. 1878, 1887, 128 L. Ed. 2d 686 (1994) (plurality opinion).

[4] Police departments, and those who work for them, are engaged in a dangerous calling and have significant powers. The public expects officers to behave with a high level of propriety, and, unsurprisingly, is outraged when they do not do so. The law and their own safety demands that they be given a degree of respect, and the sleazy activities of Ronald and

---

[5]*City of Erie*, 529 U.S. at 294, 120 S. Ct. at 1393-94.

[6]*NTEU*, 513 U.S. at 461-62, 115 S. Ct. at 1010-11.

Megan Dible could not help but undermine that respect. Nor is this mere speculation.

[5] Almost as soon as Ronald Dible's indecent public activities became widely known, officers in the department began suffering denigration from members of the public, and potential recruits questioned officers about the Dibles' website. Moreover, the department feared that the recruiting of female officers would be affected because of what it seemed to say about the climate at the department. That is not rank speculation. In a similar case involving police officers' public sexual activities, the Eleventh Circuit Court of Appeals noted that this kind of activity by officers, once known, could not help but interfere with the functions and mission of the police department because "it reflected on [deputies'] fitness as deputies and undermined public confidence" in the department. *Thaeter v. Palm Beach County Sheriff's Office*, 449 F.3d 1342, 1356 (11th Cir. 2006). Just so.

We are not gallied by the Dibles' claim that Ronald Dible is being subjected to some kind of heckler's veto. Worries about a heckler's veto have generally dealt with the restriction of a citizen's speech based upon the anticipated disorderly reaction by members of an audience. *See Rosenbaum v. City and County of San Francisco*, 484 F.3d 1142, 1158-59 (9th Cir. 2007). Those worries do not directly relate to the wholly separate area of employee activities that affect the public's view of a governmental agency in a negative fashion, and, thereby, affect the agency's mission. The Dibles' argument ignores the fact that the public can form a negative view of a person due to his particular mode of expression — there is nothing unconstitutional about that. It also ignores the unique and sensitive position of a police department and its necessary and constant interactions with the public. *See Byrd v. Gain*, 558 F.2d 553, 554 (9th Cir. 1977) (noting that police departments have special concerns regarding employees' speech due to the nature of their mission); *see also Waters*, 511 U.S. at

674-75, 114 S. Ct. at 1887-88 (noting government's significant interest in employee activity).

As the Second Circuit Court of Appeals has pointed out, even where the unrelated expression is a matter of public concern — there a comment on race relations — police officers "are quintessentially public servants" and "part of their job is to safeguard the public's opinion of them." *Locurto*, 447 F.3d at 178. Thus, said the court, the actions of the police department were not due to a heckler's veto, but rather an example of the government's accounting for the public's perception of the officers' actions when it considered the potential for disruption of the department's functions. *Id.* at 179; *see also Rankin*, 483 U.S. at 389, 107 S. Ct. at 2899 (taking particular note of the fact that a clerical employee's comments were not made public and, therefore, did not discredit the constable's office).[7]

**[6]** In fine, whether Ronald Dible's activities were related to his employment or not, the City could discipline him for those activities without violating his First Amendment rights. Thus, the Dibles' claim to the contrary must be rejected.

B.   *Right of Privacy and Freedom of Association*

The Dibles also claim that their First Amendment rights to privacy and freedom of association were violated by the City. No doubt the First Amendment does encompass a right of privacy, whose contours include within it a right to make personal decisions and a right to keep personal matters private. *See Ferm v. United States Trustee (In Re Crawford)*, 194 F.3d

---

[7]We have not overlooked *Flanagan v. Munger*, 890 F.2d 1557, 1566-67 (10th Cir. 1989) and *Berger v. Battaglia*, 779 F.2d 992, 1000-01 (4th Cir. 1985). However, to the extent that they minimize the potential for an actual effect on the efficiency and efficacy of police department functions arising from public perceptions of the inappropriate activities of police officers, they are severely undermined by *Roe*, and we decline to follow them.

954, 958 (9th Cir. 1999). It also encompasses a freedom of association right, which includes the freedom of intimate expression and the right to associate with others in activities otherwise protected by the First Amendment. *See Fleisher v. City of Signal Hill*, 829 F.2d 1491, 1499-1500 (9th Cir. 1987). Neither the Dibles' right of privacy nor their right to freedom of association was violated here.

**[7]** Beyond any other considerations, there is no evidence that the City released any information that connected the Dibles to the website. Thus, it could not have violated their right to privacy and intimate association by giving them unwanted publicity.

**[8]** Speaking of unwanted publicity leads to the obvious reflection that intimate as their activity may have been in one sense, it certainly was not intimate in the sense of an activity that they intended to hide. Megan Dible was the star of her own show and happily displayed herself to those willing to pay to view her, and even, as a teaser, to those who were not yet paying. Ronald Dible, for his part, participated in the activity, both as a performer, and as a videographer. He even appeared in public places for the purpose of advertising the Dibles' activities and their products. While some believe that when we assume the bench we enter a hibernaculum and retreat from reality, we can see that on the facts of this case the Dibles' right of privacy claims are virtually oxymorons.[8]

**[9]** Moreover, to the extent that the Dibles assert that Ronald Dible's freedom of association was violated because of his

---

[8]We recognize that Ronald Dible also asserts that inquiry into his financial interests in the website violated some asserted right of privacy. There are some limits to a governmental entity's investigation of its employees. *See Thorne v. City of El Segundo*, 726 F.2d 459, 469-71 (9th Cir. 1983). However, we have never gone so far as to suggest that those limits are exceeded where, as here, the question is directly related to the employee's connection to an otherwise unprotected activity that affects the functions and mission of the employer.

right to participate in speech activities, as we have already explained, he did not have a right to participate in the activities at hand *and* avoid City discipline at the same time.

**[10]** In short, in a case of this nature, a governmental employee cannot avoid the strictures of the balancing tests that we have heretofore described by attempting to resurrect fallen speech claims as privacy and associational claims. Those First Amendment claims must also necessarily fall with the Dibles' speech claim.

## C. *Qualified Immunity*

The Dibles also assert that the district court erred when it decided that the City's police chief, Bobby Joe Harris, was entitled to qualified immunity. In considering that question we must apply the approach delineated in *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). That involves a two-step process. We must first consider whether a constitutional right was violated by the official. *Id.* at 201, 121 S. Ct. at 2156. If not, the inquiry ends and the official is entitled to qualified immunity. *Id.* If a right was violated, we must proceed to the second step and determine whether that right was clearly established. *Id.*; *see also Brosseau v. Haugen*, 543 U.S. 194, 198-99, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004) (per curiam).

Our disposition of the Dibles' First Amendment claims demonstrates that Police Chief Harris did not violate the Dibles' constitutional rights, and that is enough to end the inquiry. But even if we were to find a violation, we would also be constrained to declare that because "whether a public employee's speech is constitutionally protected turns on a context-intensive, case-by-case balancing analysis, the law regarding such claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity." *Moran v. Washington*, 147 F.3d 839, 847 (9th Cir. 1998); *see also*

*Lytle v. Wondrash*, 182 F.3d 1083, 1088 (9th Cir. 1999). This would not be one of those rarities.

**[11]** Thus, Chief Harris was entitled to qualified immunity.

D. *State Law Claims*

**[12]** The Dibles also claim that the district court erred when it granted summary judgment on their state law claims. It did not.

They first assert that they should be able to pursue their claim to right of privacy under Arizona law. *See Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 812 (9th Cir. 2002). What we have already said about their First Amendment privacy claim applies here also. Not only does their claimed seclusion right overlook all that they did to publicize and publish their activities, but also they have wholly failed to demonstrate that the City advised the general public about their connection to their little enterprise.

They also assert that they have been subjected to the intentional infliction of emotional distress as that is described under Arizona law. *See Johnson v. McDonald*, 197 Ariz. 155, 160, 3 P.2d 1075, 1080 (App. Div. 1999). In order to prevail, they would have to show that terminating Ronald Dible because of his indecent activities was " 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.' " *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 183 Ariz. 550, 554, 905 P.2d 559, 563 (App. Div. 1995). Even if an error were made, just how the mere fact of terminating Ronald Dible for his disreputable activities could meet that standard is not apparent upon an apercu or even upon a perscrutation of the facts of this case. Surely, this is not one of those "extremely rare" instances where the tort can be found to have been committed in the employment context. *Id.*

Finally, the Dibles assert that the termination of Ronald Dible constituted a wrongful termination within the meaning of Arizona law. *See* Ariz. Rev. Stat. § 23-1501(3)(a)-(d); *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 746 (9th Cir. 2004); *Galati v. Am. West Airlines, Inc.*, 205 Ariz. 290, 292, 293 n.4, 69 P.2d 1011, 1013, 1014 n.4 (App. Div. 2003). To the extent that their claim is based upon the alleged violation of Ronald Dible's First Amendment rights it must, of course, fail. Likewise, the claim must also fail to the extent that it is intended to be an appeal from the determination of the City's Merit Board on the basis that the Board abused its discretion when it recommended affirming Ronald Dible's termination. *See Hamilton v. City of Mesa*, 185 Ariz. 420, 427-28, 916 P.2d 1136, 1143-44 (App. Div. 1995). The record clearly demonstrates that the Board could properly determine that Ronald Dible's activities discredited the police department and affected its functions.

## CONCLUSION

Even though many believe that we live in anomic times, we have not yet abandoned our social codes to the point that a city can be sanctioned for violating a police officer's First Amendment rights when he causes disrespect of the police department and its members by performing in and purveying pictures of his and his wife's sexually explicit activities over the internet. The City could properly take notice of the fact that officers and the department were vilipended. It could react to the effects that Ronald Dible's activities could be expected to and did have upon the police department's mission and functions. To paraphrase Justice Holmes:[9] Ronald Dible may have the constitutional right to run his sex oriented business, but he has no constitutional right to be a policeman for the City at the same time. Therefore, the Dibles' claims must fail.

---

[9]*See McAuliffe v. Mayor of New Bedford*, 155 Mass. 216, 220, 29 N.E. 517, 517 (1892).

AFFIRMED.

---

CANBY, Circuit Judge, concurring in the judgment:

## I

With all due respect, I am unable to join the majority opinion because I disagree with its resolution of Dible's First Amendment speech claim. Under the facts of this case and the existing precedent, the police department could not discharge Dible for his website expression without violating the First Amendment.

I have no quarrel with some of the majority's analysis. I agree that, if Dible's expressive website activity were properly characterized as employment-related, then his First Amendment claim would fail because his expression, while protected, was not of public concern. The majority opinion correctly reasons that this point is established by *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004) (per curiam).

Dible's website activity was not employment-related, however. As the majority opinion points out, Dible was careful not to identify himself or his website with the police department or with police status at all. That fact differentiates his case from *Roe*. Certainly nothing in the activity Dible portrayed suggested a connection with the police. I am unwilling to conclude, for reasons I will set forth below, that such unrelated expression becomes related to Dible's employment simply because people who disapprove of his expression find out that he is a policeman and make their disapproval or disdain known to the police department in ways that could affect its work.

As the majority opinion points out, the Supreme Court has not, in *Roe* or its antecedents, made perfectly clear whether a

governmental employee's expression unrelated to the employment must be of public concern to be protected. In my view it makes little sense to impose the public concern requirement for the protection of unrelated speech. The requirement of public concern comes from *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). Its usefulness is in making an exception to the right of a public employer to control the expression of employees in matters relating to their employment. One way of limiting the rule to its context, which I would follow, is to hold that there is no requirement that an employee's speech that is unrelated to his employment be of public concern in order to merit First Amendment protection. The Tenth Circuit adopted that rule in *Flanagan v. Munger*, 890 F.2d 1557, 1562-64 (1989). Another way of reaching the same result is to hold, as we did in *Roe*, 356 F.3d 1108, 1119 (9th Cir.), *rev'd*, 543 U.S. 77 (2004), that *any* speech by a government employee that is not about his employer, that occurs outside the workplace, and is directed to a segment of the general public, qualifies *ipso facto* as a matter of public concern. As the majority opinion here recognizes, the Supreme Court did not say this approach was incorrect when it reversed *Roe*. Similarly, in *Berger v. Battaglia*, 779 F.2d 992, 998 (4th Cir. 1985), the Fourth Circuit held, in a case of unrelated expression, that *all* such expression was of public concern unless it constituted a private personnel grievance. Either way — whether the public concern requirement is simply dispensed with for expression unrelated to employment, as I prefer, or whether the public concern requirement for unrelated speech is broadened to include virtually the universe of unrelated speech — the outcome is the same. Public concern should not be a hurdle depriving employee speech of First Amendment protection when that speech is unrelated to the employment.

Now, I recognize that pornography, although apparently popular, is not a very respected subject of First Amendment protection in many quarters. The majority opinion here reflects that distaste, variously characterizing Dible's expressive activities as "vulgar," "indecent," "sleazy," and "disrepu-

table." But vigorous enforcement of the free speech guarantee of the First Amendment often requires that we protect speech that many, even a majority, find offensive. *See, e.g., Cohen v. California*, 403 U.S. 15, 23-25 (1971). Pornography, and sexual expression in general, is protected by the First Amendment when it does not constitute obscenity (and there is no showing that Dible's expression meets that extreme standard). *See Sable Communications of Calif., Inc. v. FCC*, 492 U.S. 115, 132 (1989). We should accept that fact and accord Dible's expression the constitutional protection to which it is entitled. The majority opinion here falls short of the First Amendment standard in two major respects.

Because Dible's expressive activity was not employment-related, the police department must demonstrate that the alleged harm caused by his expression was " 'real, not merely conjectural.' " *United States v. Nat'l Treasury Empl. Union*, 513 U.S. 454, 475 (1995) (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994)). The evidence of harm in this case is so insubstantial that it can be characterized as "conjectural." An officer testified that he feared the effect on recruitment of female officers, but no such effect was demonstrated. At least three officers testified that they had been verbally harassed in a manner attributable to the website, but there was no testimony that this seriously interfered with the performance of their duties. In sum, the findings of interference with the mission of the police department are based on the conjecture that Dible's expressive activities might cause some persons to think less well of the police department and that this disfavor might in some ways lead to disruption of police activities. The evidence simply does not meet the *Treasury Employees* standard. It does not outweigh Dible's interest in expression, which is his "interest in engaging in free speech, not the value of the speech itself." *Flanagan*, 890 F.2d at 1565.[1]

---

[1] I place no significance at all on Dible's statement that he did not intend to convey any message in his expressive activity. His website constituted

A second flaw in the majority's analysis is that it enshrines the "heckler's veto" with respect to *all* conduct of a public employee, or at least of a police department employee. Nothing that Dible did or said in relation to his website activities in itself caused any disruption to police department functions. The alleged (and minimal) disruption was caused by other persons' disapproval of Dible's activities once it became known that he was an officer of the police department. The rule to be drawn from the majority's analysis, apparently, is that police officers may be fired for engaging in expressive activities, unrelated to their employment, when numbers of the public disapprove of the expression vigorously and possibly disruptively. That rule empowers the heckler to veto the speech, and is inconsistent with the First Amendment. *See Terminiello v. Chicago*, 337 U.S. 1, 4-5 (1949). In such a situation, it is the duty of the police department to prevent the disruption by those opposed to the speech, not to suppress or punish the speech. *See Cohen*, 403 U.S. at 23.

The heckler's veto applied to sexually expressive activities has disturbing potential for expansive application. A measurable segment of the population, for example, is vigorously antagonistic to homosexual activity and expression; it could easily be encouraged to mobilize were a police officer discovered to have engaged, off duty and unidentified by his activity, in a Gay Pride parade, or expressive cross-dressing, or any number of other expressive activities that might fan the embers of antagonism smoldering in a part of the population. For this reason, it is far better to adopt a rule that protects off-duty speech unrelated to employment when the speech itself causes no *internal* problems, and the only disruption is in the external relations between the police department and the pub-

---

expression, and he has raised a First Amendment defense to his termination because of his website activity. It is equally irrelevant to his First Amendment protection that he sought to make money from his expression, as many speakers or writers do. *See, e.g., Smith v. California*, 361 U.S. 147, 150 (1959).

lic unhappy with the police officer's expression. The Tenth Circuit adopted just such a rule. *See Flanagan*, 890 F.2d at 1566. The Fourth Circuit avoided adopting an inflexible rule, but held that a police department could not prohibit off-duty, unrelated speech by an officer under circumstances parallel to those in Dible's case: "[N]ot only was the perceived threat of disruption only to external operations and relationships, it was caused not by the speech itself but by threatened reaction to it by offended segments of the public." *Berger*, 779 F.2d at 1001. This public reaction in *Berger* was not inconsequential; it threatened to disrupt the tenuous relationship between the police department and the black community. Even so, "this sort of threatened disruption by others reacting to public employee speech simply may not be allowed to serve as justification for public employer disciplinary action directed at that speech." *Id.*

The majority opinion states that to the extent that *Flanagan* and *Berger* "minimize the potential for an actual effect on the efficiency and efficacy of police department functions arising from public perceptions of the inappropriate activities of police officers, they are severely undermined by *Roe.*" *Supra*, p. 1648 n.7. The rationale of *Flanagan* and *Berger*, however, was not that disruption was minimal, but that as part of the heckler's veto it could not support discipline of the employee. It is true that *Roe* permitted discipline of an officer because of public reaction to his expressive conduct, but that expressive conduct was purposely employment-related. The head of a governmental agency is entitled to control the speech of members of the agency with regard to agency-related matters, unless that speech is a matter of public concern. *Pickering*, 391 U.S. at 574. But that rule is an exception to the general First Amendment protection of speech. *See Treasury Employees*, 513 U.S. at 465. To apply the same restriction to off-duty expression by a public employee, unrelated to his employment, is to reject the established principle that public employees may not be required to surrender their constitutional right of free speech as a condition of their employment. *See, e.g.*,

*Keyishian v. Board of Regents*, 385 U.S. 589, 605 (1967). *Roe* did not extend to off-duty conduct unrelated to employment, and accordingly it did not undermine *Flanagan* and *Berger.*

In my view, the rationale of *Flanagan* and *Berger* is not only sound, but constitutionally required. We should apply those principles and hold that Dible's expressive website conduct was an unconstitutional ground for his discharge.[2]

## II

I concur in the judgment, however, because the record demonstrates that any rational trier of fact would find that Dible would have been discharged for making false statements to police department investigators, had he not been discharged for his website activity. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). There was ample and uncontradicted evidence that, early in the investigation, Dible denied any connection with the website, and later denied that he appeared in any of the videos. He also denied telling anyone to lie about his involvement in the website, when he had told a co-worker to lie. Although some of these statements were later "corrected" or modified, the original deception was clearly established.

The false statements constituted one of the two charges in the investigative complaint, and that violation of personnel rules was listed as a class 7 violation. The minimum and only authorized sanction for a class 7 violation, as listed in the

---

[2]In light of the fact that a majority of the panel disagrees with my conclusion that Dible could not be discharged because of his website activity, I concur in the majority's ruling that Chief Harris is entitled to qualified immunity because the constitutional law that he allegedly violated was not clearly established.

I also concur in the majority's rejection of Dible's claims of violation of his right of privacy and freedom of association, as well as its rejection of his state-law claims.

report, was dismissal for a first offense. The City Merit Board referred to Dible's false denial of involvement, and found that Dible had been "less than truthful." A majority of the Board accordingly sustained the charge of dishonesty. The City Manager subsequently accepted the Board's recommendation and terminated Dible, in a memorandum that devoted more discussion to Dible's false statements than to his website activities.

There is little question, therefore, that Dible's false statements would have caused his discharge even in the absence of his website activity, and that such a discharge would not have been arbitrary or capricious.

Dible contends, however, that his false statements cannot be a ground for discharge because the entire investigation was instituted because of his First Amendment protected activity. He relies on *Gilbrook v. City of Westminster*, 177 F.3d 839, 854 (9th Cir. 1999), which held that subordinates who retaliated against an employee for protected activity were not shielded when they initiated termination proceedings that ultimately resulted in a discharge of the employee by superiors who acted without a retaliatory motive. *Gilbrook* is distinguishable on several grounds, but two are sufficient for present purposes. First, *Gilbrook* did not involve false statements or other misconduct by the employee during the administrative process. Second, the disciplinary process in *Gilbrook* "*began* with a retaliatory motive, but *ended* with a legitimate one." *Id.* The investigation by the police department in the present case was not illegitimate in its inception. The department was entitled to inquire into Dible's off-duty activity to see whether it was employment-related, which would bring it within the unprotected scope of *Roe*. In addition, the department had a policy requiring police officers to obtain prior approval before engaging in any outside employment, because certain jobs were deemed compromising. The department was entitled to inquire whether this policy had been violated. Nothing in the nature of the investigation entitled Dible to lie.

I am persuaded, therefore, that Dible would have been fired for his unprotected false statements, and that his discharge would not have been arbitrary, capricious, or contrary to law. I therefore concur in the judgment affirming the dismissal of Dible's claims.