**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

<table>
<tr><td>RONALD GODWIN,<br><br>               Plaintiff-Appellant,<br><br>   v.<br><br>ROGUE VALLEY YOUTH<br>CORRECTIONAL FACILITY, (RVYCF);<br>et al.,<br><br>               Defendants-Appellees.</td><td>No.   14-35042<br><br>D.C. No. 1:12-cv-00478-CL<br><br>MEMORANDUM*</td></tr>
</table>

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, District Judge, Presiding

Argued and Submitted July 5, 2016
Portland, Oregon

Before: PREGERSON, BEA, and OWENS, Circuit Judges.

Plaintiff-Appellant Ronald Godwin appeals from the district court's grant of

summary judgment in favor of Defendants-Appellees Rogue Valley Youth

---

     *    This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

Correctional Facility ("RVYCF"), the Oregon Youth Authority ("OYA"),[1] Superintendent Ken Jerin, Director Collette Peters, and Assistant Director Jean Straight[2] (collectively, "Defendants"). The district court determined that Godwin was not wrongfully terminated in violation of his First Amendment rights to association and free speech. We reverse the district court's grant of summary judgment and remand for further proceedings. Because the parties are familiar with the facts of this case, we do not repeat them here.

To state a prima facie case for his hybrid speech/association claim, Godwin must show that: (1) he engaged in protected speech and/or association, (2) Defendants "took an adverse employment action" against him, and (3) his speech and/or association was "a substantial or motivating factor for the adverse employment action." *Hudson v. Craven*, 403 F.3d 691, 695 (9th Cir. 2005) (quoting *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004)). It is undisputed that Defendants terminated Godwin because of his expressive conduct and association with the Vagos motorcycle club. Thus, the question before us is

---

[1] The OYA operates RVYCF and is a department of the State of Oregon.

[2] Though Defendants appear to have asserted the defense of qualified immunity in their answer to the complaint, the issue was not raised on appeal, so we do not address it here. Nor do we address whether the Eleventh Amendment has any application here.

whether Godwin's wearing of Vagos insignia ("colors")[3] and association with Vagos is protected under the First Amendment, which in this context requires that his expression/association relates to a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 149 (1983) (holding that a public employee is protected against adverse employment action only as to expression that can be said to "touch upon a matter of public concern").

Godwin's expression/association was related to a matter of public concern, the scope of which we construe "broadly." *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 978 (9th Cir. 2002). "Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting *Connick*, 461 U.S. at 146). "[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004) (per curiam). Here, Godwin's wearing of the Vagos insignia and associating with Vagos members could be

---

[3] Wearing motorcycle club insignia is expressive conduct because it conveys a message that the wearer supports or is proud to be affiliated with the organization. *See, e.g.*, *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 966-67 (9th Cir. 2002), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 55 U.S. 7, 21 (2008).

perceived as public support of Vagos—i.e., approving of the activities of a perceived criminal organization. This is a matter of interest to the community. Further, the criminality of motorcycle clubs is a topic of "legitimate news interest." *Id.*; *see also Roe v. City & County of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997) ("To deserve First Amendment protection, it is sufficient that the speech concern matters in which even a relatively small segment of the general public might be interested."); *accord Piscottano v. Murphy*, 511 F.3d 247, 274-76 (2d Cir. 2007).

As Godwin established a prima facie case of retaliatory termination, the burden shifts to the government to demonstrate that its legitimate interest "in promoting the efficiency of the public services it performs through its employees" outweighs Godwin's First Amendment right. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)); *see also Hudson*, 403 F.3d at 695.

Here, the *Pickering* balancing test does not favor the government as a matter of law. With respect to the functioning of a public enterprise, "[a]n employer may not interfere with an employee's First Amendment rights unless there is evidence that the employee's actions have actually disrupted the workplace or are reasonably likely to do so in the future." *Nichols v. Dancer*, 657 F.3d 929, 931

4

(9th Cir. 2011). Critically, "[s]imply saying that there has been or will be disruption, without supporting evidence, is not enough." *Id.* To show actual or potential disruption, pertinent considerations include whether the speaker's expression impeded his job performance, impaired personnel relationships (including "discipline by superiors or harmony among co-workers"), or otherwise interfered with "the regular operation of the enterprise." *Rankin*, 483 U.S. at 388.

Nothing in the record on summary judgment indicates that Godwin's expression impeded the performance of his job duties, adversely affected discipline or personnel relationships, or interfered with the work of the OYA. Nor does the record indicate that his expression would be reasonably likely to disrupt the workings of the OYA in the future. Godwin had been affiliated with Vagos for his entire fourteen-year tenure with the OYA, which was known to several of his co-workers, including supervisors. Indeed, Godwin had arranged "motorcycle shows" for the OYA youth, to which he would invite members of motorcycle clubs to speak. There are no complaints in the record regarding Godwin inviting these motorcycle club members to speak to the youth. Instead, he has offered evidence that he used "his past experiences and involvement in Vagos . . . to help the youth understand, no matter who they are and what they have done[,] they can turn their life around and be positive people." Additionally, Godwin was viewed as an

5

exemplary employee; he received an award for his "outstanding service" four months prior to his termination, and his co-workers affirmed his value to the OYA through a letter of support. Defendants' purported fears of future disruption are also unsupported in light of the fact that, upon being informed of Defendants' concerns about his association with Vagos, Godwin immediately offered to never again wear his Vagos colors or attend Vagos events.

On this record, where there is no evidence of actual disruption and Defendants' predictions of future disruption are purely speculative, the district court erred in granting summary judgment in favor of Defendants.[4] *See Nichols*, 657 F.3d at 933-34 ("[A]n employer cannot prevail under *Pickering* based on mere speculation that an employee's conduct will cause disruption.").

**REVERSED AND REMANDED.**

---

[4] In light of this holding, we need not reach the question of whether Godwin waived his pure association claim.

*Godwin v. Rogue Valley Youth Correctional Facility*, No. 14-35042



Bea, Circuit Judge, Dissenting,

I agree that an expression of support for the "Vagos," an organization classified by the Federal Bureau of Investigation ("FBI") as an "outlaw motorcycle gang," "touches on" a matter of public concern, *Connick v. Myers*, 461 U.S. 138, 149 (1983). I disagree with the majority's requirement that actual evidence of disruption is essential before a law enforcement agency can fire an employee for his affiliation with, or expression in support of, the "Vagos." Such affiliation or expression is contrary to his governmental employer's mission, as reflected in its important law enforcement interests. I would find that the government employer has a strong safety interest in maintaining public respect for its law enforcement agencies and officials, and that this interest is necessarily undermined when a law enforcement employee engages in conduct or speech antithetical to his employer's legitimate law enforcement mission. Under these circumstances, the employer is justified in terminating the aberrant employee as a matter of law. For this and the reasons set forth below, I would uphold the district court's grant of summary judgment in defendants' favor.

We have previously recognized (in the Fourth Amendment context) that law enforcement agencies' unique character as "paramilitary" organizations justifies

1

greater curtailment of their employees' constitutional rights, given the employer's—as well as the public's—strong interest in the provision of safe and effective law enforcement services. *Aguilera v. Baca*, 510 F.3d 1161, 1168 (9th Cir. 2007) ("While 'policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights,' . . . . society has an equally important interest in ensuring the highest integrity by those entrusted with discharging the duties of a peace officer." (quoting *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967))).

This principle applies with equal force in the First Amendment context. *See Locurto v. Giuliani*, 447 F.3d 159, 179 (2d Cir. 2006) (Calabresi, J.) ("Because police departments function as paramilitary organizations charged with maintaining public safety and order, they are given more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer." (quoting *Tindle v. Caudell*, 56 F.3d 966, 971 (8th Cir. 1995))); *Jurgensen v. Fairfax Cty.*, 745 F.2d 868, 880 (4th Cir. 1984) (In applying *Pickering*, "courts must give weight to the nature of the employee's job in assessing the possible effect of his action on employee morale, discipline or efficiency. . . . [with] university professors [falling] at one end [of the spectrum] to policemen at the other. State inhibition of academic freedom is strongly disfavored. In polar contrast is the discipline demanded of, and freedom

2

correspondingly denied to policemen." (citing *Wieman v. Updegraff*, 344 U.S. 183, 195 (1952) (Frankfurter, J., concurring))).

Indeed, we recognized as much in *Dible v. City of Chandler*, 515 F.3d 918 (9th Cir. 2007), where we affirmed a grant of summary judgment in favor of the Chandler, Arizona Police Department and other government defendants on claims that the termination of a police officer for operating a for-profit pornography website violated the officer's freedom of speech, *id.* at 922, 924, 931. In concluding that the government reasonably predicted that the plaintiff-employee's operation of a pornography website would disrupt the provision of law enforcement services, we reasoned:

> Police departments, and those who work for them, are engaged in a dangerous calling and have significant powers. *The public expects officers to behave with a high level of propriety*, and, unsurprisingly, is outraged when they do not do so. The law and *their own safety demands that they be given a degree of respect*, and the sleazy activities of Ronald and Megan Dible could not help but undermine that respect. Nor is this mere speculation.

*Id.* at 928 (emphasis added).

Nor are we alone in our recognition that law enforcement agencies require public respect to perform their jobs safely and effectively. In *Locurto v. Giuliani*, 447 F.3d 159 (2d Cir. 2006) (Calabresi, J.), a police officer and two firefighters sued various New York state defendants, alleging that they were unlawfully terminated in retaliation for their participation in a Labor Day parade float that

3

"featured mocking stereotypes of African–Americans" in violation of the First Amendment. *Id.* at 163. The day following the incident, New York Mayor Rudolph Giuliani was quoted as stating, "I'm not going to take the responsibility of keeping [Locurto] on the police force and then three years from now he hurts somebody and somebody wants to know why he wasn't removed." *Id.* at 165 (quoting Kit. R. Roane, *Suspended Police Officer Apologizes, Calling Float "a Big Mistake,"* N.Y. Times 51 (Sept. 13, 1998)). The Second Circuit "conclude[d] that the defendants fired the plaintiffs out of a reasonable concern for disruption, and that this concern outweighed the plaintiffs' individual expressive interests." *Id.* In so holding, the Second Circuit reasoned that defendants "legitimately regard[ed] as 'disruptive' expressive activities that instantiate or perpetuate a widespread public perception of police officers and firefighters as racist." *Id.* at 178. This was so, the court explained, because:

> Police officers and firefighters alike are quintessentially public servants. As such, part of their job is to safeguard the public's opinion of them, particularly with regard to a community's view of the respect that police officers and firefighters accord the members of that community. . . . Where a Government employee's job quintessentially involves public contact, the Government may take into account the public's perception of that employee's expressive acts in determining whether those acts are disruptive to the Government's operations.

*Id.* at 178–79. Accordingly, the Second Circuit reversed the district court's grant of summary judgment in favor of the plaintiffs and remanded with instructions to enter judgment for the defendants instead. *Id.* at 163.

4

Just as public respect for law enforcement is inherently undermined when a police officer engages in "sleazy" activities like pornography, or racist expression which alienates communities the officer may be called upon to protect, so too is public respect fundamentally undercut when a spiritual leader for crime-prone youth offenders proudly and publicly associates with an organization classification by the FBI as a criminal organization.

Here, the following is undisputed: Plaintiff Ronald Godwin ("Godwin") was terminated because he associated with Vagos motorcycle club members and was seen around town wearing Vagos "colors" and paraphernalia. The Oregon Youth Authority's ("OYA") mission "is to protect the public and reduce crime by holding youth offenders accountable and providing opportunities for reformation in safe environments." Regardless whether Godwin's association with Vagos *actually* interfered with OYA's mission, OYA senior management reasonably predicted that the conflict between his employer's mission and Godwin's activities would undermine public respect for OYA, and thereby impair OYA's ability effectively to rehabilitate youth offenders. *Dible* and *Locurto* hold that this is enough to justify a grant of judgment in the government's favor.

The late Justice Scalia put it well: "[N]o law enforcement agency is required by the First Amendment to permit one of its employees to 'ride with the cops and

5

cheer for the robbers.'" *Rankin v. McPherson*, 483 U.S. 378, 394 (1987) (Scalia, J., dissenting).

To the extent the majority suggests to the contrary, I respectfully dissent.