**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| THELMA BARONE, an individual, *Plaintiff-Appellant*, | No. 17-35355 |
| | D.C. No. 6:15-cv-01552-AA |
| v. | |
| CITY OF SPRINGFIELD, Oregon, a municipal corporation; TIM DONEY, individually, and as Chief of Police of the Springfield Police Department; TOM RAPPE, individually, and as a Lieutenant of the Springfield Police Department; GINO GRIMALDI, individually, and as City Manager of the City of Springfield; GRETA UTECHT, individually, as Director of Human Resources for the City of Springfield, *Defendants-Appellees*. | OPINION |

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted June 5, 2018
Portland, Oregon

Filed September 5, 2018

Before:  MILAN D. SMITH, JR. and MARY H.
MURGUIA, Circuit Judges, and ALVIN K.
HELLERSTEIN,[*] District Judge.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[**]

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment and remanded in an action brought pursuant to 42 U.S.C. § 1983 alleging that plaintiff was retaliated against in her employment as a Community Service Officer for the Springfield Police Department, in violation of her First Amendment rights.

Plaintiff asserted that appellees retaliated against her after she responded at a public event to a citizen inquiry about racial profiling by the Police Department. The panel held that plaintiff's retaliation claim failed because she spoke as a public employee, so her speech was not protected by the First Amendment. The panel noted that plaintiff's speech at the event clearly fell within her job duties. Plaintiff was aware that she was speaking as a representative of the Department and discussing her work with the Department. Moreover, the panel noted that the speech at

---

[*] The Honorable Alvin K. Hellerstein, United States District Judge for the Southern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

issue was a response to an inquiry about racial profiling complaints, a type of complaint plaintiff regularly received in her capacity as a Community Service Officer.

The panel next held that an amended Last Chance Agreement which plaintiff was required to sign before returning to work was an unconstitutional prior restraint. Paragraph 5(g) of the amended Agreement barred plaintiff from saying or writing anything negative about the Department, the City or its employees. The panel held that Paragraph 5(g) restrained plaintiff's speech as a private citizen on matters of public concern, and appellees had not presented justifications sufficient to warrant Paragraph 5(g)'s overbroad restrictions. The panel thus held that Paragraph 5(g)'s prospective restriction violated the First Amendment.

Addressing plaintiff's claim of municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the panel held that there was a genuine issue of material fact about whether the City Manager delegated final policymaking authority over employee discipline to the Police Chief. If such authority was delegated, the City would be liable under *Monell.* The panel therefore reversed and remanded for consideration of whether the City could be held liable for the Police Chief's conduct in requiring plaintiff to sign the amended Agreement.

**COUNSEL**

Andrew Lewinter (argued), Eugene, Oregon, for Plaintiff-Appellant.

Mark C. Sherman (argued) and Janet M. Schroer, Hart Wagner LLP, Portland, Oregon, for Defendants-Appellees.

**OPINION**

M. SMITH, Circuit Judge:

Thelma Barone brought this 42 U.S.C. § 1983 action against the City of Springfield and several of its employees (collectively, Appellees). Barone now appeals from the district court's order granting summary judgment in favor of Appellees on all of her claims. We affirm the district court respecting her First Amendment retaliation claim, reverse the district court concerning her prior restraint claim, and reverse and remand on the issue of *Monell* liability.

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2003, Barone began working for the Springfield Police Department (Department) as a Community Service Officer II (CSO II). She focused on victim advocacy, and served as a Department liaison to the City's minority communities. Throughout her tenure, members of the Latino community complained to Barone about racial profiling by the Department. She relayed these complaints to Department leadership.

These complaints became more frequent beginning in spring 2013. Around that same time, the Department was in the midst of a leadership transition, which led to, among

other things, Tim Doney's appointment as Chief of Police. As directed, Barone drafted her job description and sent it to Chief Doney.

In 2014, the Department began investigating Barone in connection with two Department-related incidents. The first incident involved a school tour Barone led through the Department. During the tour, some students took photos of restricted areas, where no photo taking was permitted. Department employees disputed whether Barone had asked for, and received, approval for the students to photograph each unit. In the second incident, a Latina notified Barone of a potential crime. Barone was unable to reach a sergeant about this crime, but she left a message with the dispatchers and asked the sergeant to return her call. The sergeant never returned her call because he said he did not know the phone call pertained to a possible crime. The parties disputed whether Barone informed the dispatchers that she wanted to speak to the sergeant about an alleged crime.

On February 5, 2015, Barone spoke at a City Club of Springfield event headlined "Come Meet Thelma Barone from the Springfield Police Department." The Department paid her to attend the event; she wore her uniform; and her supervisor attended. She understood that she attended and participated in the event as a representative of the Department. A member of the audience at the event asked her whether she was aware of increasing community racial profiling complaints. She said that she "had heard such complaints."

A week later, Chief Doney placed Barone on administrative leave due to her alleged untruthfulness in connection with investigations into the two pre-2015 occurrences. Almost a month later, the Department found that Barone had violated several sections of the

Department's code of conduct, and she remained on administrative leave.

The Department's investigation of the two incidents continued into the summer. In July 2015, the Department suspended Barone for four weeks without pay, and informed her that she would be required to sign a Last Chance Agreement (the Agreement) when she returned to work. Barone, her union representative, and Chief Doney met to discuss the Agreement on the day that Barone returned to work. At the meeting, Chief Doney provided Barone with a copy of the Agreement, told her to review it, and told her that the Department would terminate her if she did not sign it. A week later, Barone refused to sign the original Agreement because it prohibited her from reporting on racial profiling and discrimination.

At a subsequent meeting, Chief Doney provided Barone with an amended Agreement that addressed her stated concerns with the original Agreement. Paragraph 5(g) of the amended Agreement barred Barone from saying or writing anything negative about the Department, the City, or their employees. However, she could report complaints involving discrimination or profiling by the Department. The amended Agreement also provided that Barone would remain subject to a generally applicable order that barred her from publicly criticizing or ridiculing the Department and barred her from releasing confidential information.

At the second meeting, Barone did not express concern about any particular provision of the amended Agreement. Nevertheless, after speaking with her representative, Barone refused to sign the Agreement as amended. Because Barone refused to sign the amended Agreement, Chief Doney terminated her employment with the Department.

Citing 42 U.S.C. § 1983, Barone sued the City, Chief Doney, Department Lieutenant Tom Rappe, City Manager Gino Grimaldi, and Human Resources Director Greta Utecht for First Amendment retaliation, and imposing an unlawful prior restraint.  In May 2016, the district court denied Barone's motion for partial summary judgment on her prior restraint claim.  In April 2017, the district court granted summary judgment in favor of Appellees on Barone's claims.  Barone timely appealed.[1]

## STANDARD OF REVIEW

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.  We review de novo a district court's grant of summary judgment.  *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1177 (9th Cir. 2016).  We may affirm on any ground supported by the record.  *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1064 (9th Cir. 2016).

## ANALYSIS

### I.  First Amendment Retaliation

We turn first to Barone's First Amendment retaliation claim, in which she asserts that Appellees retaliated against her after she spoke at the February 2015 City Club event.  We affirm the district court, and conclude that Barone's First Amendment retaliation claim fails because she spoke as a public employee, so her speech was not protected by the First Amendment.

---

[1] The district court concluded that the individual defendants were protected by qualified immunity.  Barone did not appeal that portion of the district court's judgment.

First Amendment retaliation claims are analyzed under the five-factor inquiry described in *Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009). Barone must show that (1) she spoke on a matter of public concern; (2) she spoke as a private citizen rather than a public employee; and (3) the relevant speech was a substantial or motivating factor in the adverse employment action. *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1259 (9th Cir. 2016) (citing *Eng*, 552 F.3d at 1070–71). If Barone establishes such a prima facie case, the burden shifts to the government to demonstrate that (4) it had an adequate justification for treating Barone differently than other members of the general public; or (5) it would have taken the adverse employment action even absent the protected speech. *Id.* (citing *Eng*, 552 F.3d at 1070–72). "[F]ailure to meet any [factor] is fatal to the plaintiff's case." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013) (en banc).

The answer to the first *Eng* prong is clear. Barone's speech—responding to a citizen inquiry about racial profiling by the Department—is a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 148 (1983) (noting speech warrants protection when it "seek[s] to bring to light actual or potential wrongdoing or breach of public trust"). The second prong of *Eng* is key to the outcome of the First Amendment retaliation claim in this case. Specifically, did Barone speak as a private citizen or as a public employee at the City Club event?

In the Supreme Court's foundational case in this area of the law, the Court held that a school district violated a teacher's right to free speech when it fired him for writing a letter to a local newspaper that criticized a school board decision concerning a local tax issue. *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 564–65

(1968). In concluding that the teacher spoke as a private citizen, the Court noted that the teacher's statements were not "directed towards any person with whom [the teacher] would normally be in contact in the course of his daily work" and the publication of the letter did not "interfere[] with the regular operation of the schools generally." *Id.* at 569–70, 572–73.

The Court provided further guidance on public employee speech in *Garcetti v. Ceballos*, holding that "when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. 410, 421 (2006) (emphasis added). The Court held that an internal memorandum prepared by a prosecutor in the course of his ordinary job responsibilities was unprotected employee speech because he was "fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case." *Id.* In other words, his "expressions were made pursuant to his duties as a calendar deputy" and "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421–22.

*Garcetti* instructed that

> The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's

> professional duties for First Amendment
> purposes.

*Id.* at 424–25.  Thus, we engage in a "practical" inquiry into an employee's "daily professional activities" to discern whether the speech at issue occurred in the normal course of those ordinary duties.  *Id.* at 422, 424.  In doing so, we do not focus on "[f]ormal job descriptions," *id.* at 424, because "[t]he critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties," *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014).

Whether an individual speaks as a public employee is a mixed question of fact and law.  *Kennedy v. Bremerton Sch. Dist.*, 869 F.3d 813, 823 (9th Cir. 2017), *petition for cert. filed* (U.S. June 25, 2018) (No. 18-12).  "First, a factual determination must be made as to the 'scope and content of a plaintiff's job responsibilities.'" *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011) (quoting *Eng*, 552 F.3d at 1071).  "Second, the 'ultimate constitutional significance' of those facts must be determined as a matter of law." *Id.* (quoting *Eng*, 552 F.3d at 1071).  Applying these principles, Barone clearly spoke as a public employee at the City Club event.

Barone argues that she was speaking as a private citizen because the City Club event did not fall within her CSO II job description.  The Department's general job description for CSO II officers lists eight "essential duties," which primarily concern supporting the Latino and Hispanic community regarding domestic violence issues.**[2]**  However,

---

**[2]** The eight "essential duties" are: (1) to serve as Department Outreach and Education Advocate for the Hispanic community to, in

"[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform"; therefore, "an employee's written job description is neither necessary nor sufficient" to determine the scope of the employee's job. *Garcetti*, 547 U.S. at 424–25. In *Dahlia*, we overruled one of our prior cases for "improperly rel[ying] on a generic job description and fail[ing] to conduct the 'practical,' fact-specific inquiry required by *Garcetti*." 735 F.3d at 1071 (overruling *Huppert v. City of Pittsburg*, 574 F.3d 696 (9th Cir. 2009)).

Applying *Garcetti*'s practical, fact-specific inquiry, Barone's job entailed more than communicating with the Hispanic community about domestic violence issues. Throughout her employment, Barone "occasionally received complaints from citizens who believed that the Police Department had racially profiled them." Beginning in spring 2013, Barone noted there was a "marked increase in the number of complaints of racial profiling," and she "regularly received" complaints of racial profiling "from the members of the Latino community." Part of her job included "work[ing] with the various minority communities" in responding "to complaints they may have about police matters."

Her job also included attending various community outreach events to "obtain information relevant to [the]

---

part, "locate victims of domestic violence"; (2) to "[p]rovide[] follow-up services to victims of domestic violence"; (3) to implement an advocacy program that makes law enforcement services and community safety programs more accessible; (4) to provide leadership for "problem solving efforts unique to the City's Hispanic community"; (5) to serve as a primary source of information for the media; (6) to participate in training volunteers; (7) to operate Department vehicles and equipment; and (8) to prepare and submit monthly work reports.

community . . . that are important" to the Department's law enforcement activities. One of her self-defined regular duties was "develop[ing] and provid[ing] presentations and trainings . . . to the general public describing our services and how we have implemented cultural considerations when assisting victims of crime."

With this background in mind, Barone's speech at the City Club event clearly fell within her job duties. She was speaking at a "community event" with "the general public" where she was describing the Department's services and discussing issues relevant to the Hispanic community. Barone characterized this meeting to her superiors as part of the Department's "outreach to multicultural communities." She was also aware that she was speaking as a representative of the Department and discussing her work with the Department. Moreover, the speech at issue was a response to an inquiry about racial profiling complaints, a type of complaint she regularly received in her capacity as a CSO II.

It is true that this communication was "outside of [her] chain of command," which can be relevant "particularly in a highly hierarchical employment setting such as law enforcement." *Dahlia*, 735 F.3d at 1074. However, this lone factor is not enough to transform employee speech into private citizen speech. Barone's job as a CSO II is apart from the typical hierarchical employment ladder in a police department. Her job *required* her to interact and communicate with the public. Therefore, this case is distinct from other cases involving more typical law enforcement employees, such as a prison official who writes letters to a state senator about sexual misconduct at the prison, *see Freitag v. Ayers*, 468 F.3d 528, 545–46 (9th Cir. 2006), or a police officer who issues press releases while serving as the

president of the police officer union, *see Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1059–60 (9th Cir. 2013).

Similarly, it is not dispositive that another individual was the Department's official spokesperson.  The Department spokesperson's duties focus on interactions with the media, such as fostering dialogue with the media, preparing press releases, and serving as a contact person for media inquiries.  In contrast, Barone was interacting with the public, not the media, at the City Club event.  An employee does not speak as a citizen merely because the employee directs speech towards the public, or speaks in the presence of the public, particularly when an employee's job duties include interacting with the public.  *See Brandon v. Maricopa County*, 849 F.3d 837, 845 (9th Cir. 2017) (holding a county attorney's comments to a newspaper about a civil action against the sheriff's department constituted public employee speech in part because "her public statements touched on the very matter on which she represented the county"); *cf. Kennedy*, 869 F.3d at 827 ("When acting in an official capacity in the presence of students and spectators, [the football coach] was also responsible for communicating [his employer's] perspective on appropriate behavior through the example set by his own conduct.").

Other facts support our conclusion that Barone spoke as a public employee.  While members of the public spoke and asked her questions at the event, she had special access to the event because of her position, highlighted by the event's title:  "Come Meet Thelma Barone from the Springfield Police Department."  Not only did Barone's speech fall within the "tasks [she] was paid to perform," *Ellins*, 710 F.3d at 1058 (quoting *Eng*, 552 F.3d at 1071), but she spoke while clothed in official attire, while on the clock, and in a location she had access to by virtue of her position.  *See Kennedy*,

869 F.3d at 827 (holding that a high school coach was a public employee when he engaged in expressive conduct at a school event, wearing school attire, while on duty, and while in a location that he had access to by virtue of his position).

Barone alternatively argues that her job required her to work with communities of color to handle complaints, but the speech here was answering a citizen's question. This argument also fails. Barone's job involved handling complaints and, at a general level, working with the Hispanic community to build trust between the Springfield Hispanic community and law enforcement. Barone's speech was in response to a question *about* racial profiling complaints. Her answer, at an event that falls within her job duties, is "inextricably intertwined" with her duties as a CSO II. *See Hagen v. City of Eugene*, 736 F.3d 1251, 1259 (9th Cir. 2013) (concluding plaintiff spoke as a public employee where he raised "concerns about SWAT safety," which was "inextricably intertwined with his duties as a K-9 officer" despite no "formal written duty to do so"). Moreover, even if answering the question had fallen hypothetically outside of Barone's job duties, she did not cease speaking as a public employee when the conversation moved briefly beyond the narrow range of topics included within her job duties when she attended an event in her official capacity. *See Johnson*, 658 F.3d at 967–68 (holding a teacher does not cease acting as a teacher when "the conversation moves beyond the narrow topic of curricular instruction"); *see also Kennedy*, 869 F.3d at 828 (adopting *Johnson*'s reasoning for coaches). Adopting Barone's argument here would require employers to parse individual lines of speech, and would result in an impractical standard for public employers going forward.

That Barone did not "speak[] in direct contravention to [her] supervisor's orders" further supports our conclusion that she spoke as a public employee. *Dahlia*, 735 F.3d at 1075. Barone was the listed speaker in the City Club event's advertisement, her supervisors were aware of the event, and one of her supervisors attended the event. There is no evidence that her supervisors instructed her not to speak at this event or instructed that she limit her speech to a certain topic, such as domestic violence.

In sum, Barone was fulfilling her professional duty as a CSO II for the Department when she spoke at the City Club event. Because she spoke as a public employee, and not as a private citizen, her speech was unprotected, and her First Amendment retaliation claim fails.

## II. Prior Restraint

We next address Barone's claim that the amended Agreement was an unconstitutional prior restraint. Chief Doney required Barone to sign the amended Agreement in order to keep her job, and he fired Barone when she refused to sign it. Because the amended Agreement fails to pass muster under the *Pickering* test, we reverse the district court's grant of summary judgment in favor of Appellees on Barone's prior restraint claim.

"[C]itizens do not surrender their First Amendment rights by accepting public employment." *Lane*, 134 S. Ct. at 2374. Indeed, the public has an interest "in receiving the well-informed views of government employees engaging in civic discussion," *Garcetti*, 547 U.S. at 419, because government employees are "in the best position to know what ails the agencies for which they work," *Lane*, 134 S. Ct. at 2377 (quoting *Waters v. Churchill*, 511 U.S. 661, 674 (1994) (plurality opinion)). Nevertheless, the government

"has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *See Pickering*, 391 U.S. at 568. Government employers, similar to private employers, "need a significant degree of control over their employees' words and actions." *Lane*, 134 S. Ct. at 2377 (quoting *Garcetti*, 547 U.S. at 418). Thus, the government, in some instances, "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. Nat'l Treasury Emps. Union* (*NTEU*), 513 U.S. 454, 465 (1995).

The Court in *Pickering* prescribed a two-step approach for evaluating these competing interests. We first ask whether the restriction affects a government employee's speech "as a citizen on a matter of public concern." *See Garcetti*, 547 U.S. at 418. If it does, we inquire "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* While the *Pickering* test is most often applied in the retaliation context, we also use it to evaluate prospective restrictions on government employee speech. *See NTEU*, 513 U.S. at 465–68; *Gibson v. Office of Attorney Gen.*, 561 F.3d 920, 926–27 (9th Cir. 2009).

Paragraph 5(g) of the amended Agreement states: "Consistent with SPD General Order 26.1.1.XIX, Employee will not speak or write anything of a disparaging or negative manner related to the Department/Organization/City of Springfield or its Employees. Employee is not prohibited from bringing forward complaints she reasonably believes involves discrimination or profiling by the Department." In

turn, General Order 26.1.1.XIX,**[3]** which applies to all Department employees, provides, in part: "Members shall not publicly criticize or ridicule the Department, its policies, or other members. . . . Members shall conscientiously avoid the release of any confidential information or information which compromises any investigation."

## A. The Amended Agreement Restricts Private Citizen Speech on Matters of Public Concern.

The first step of the *Pickering* test involves two separate inquiries—first, whether the restriction reaches speech on a matter of public concern, and second, whether the restriction reaches speech only within the scope of a public employee's official duties. *See Garcetti*, 547 U.S. at 418. "In assessing a prior restraint, we focus on the text of the policy to determine the extent to which it implicates public employees' speech as citizens speaking on matters of public concern." *Moonin v. Tice*, 868 F.3d 853, 861 (9th Cir. 2017).

It is clear that Paragraph 5(g) extends to matters of public concern. "Speech involves matters of public concern 'when it can "be fairly considered as relating to any matter of political, social, or other concern to the community . . . ."'" *Lane*, 134 S. Ct. at 2380 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). This is a broad standard, and Paragraph 5(g)'s bar is not limited to speech on internal issues such as logistics or individual personnel disputes. *See Gibson*, 561 F.3d at 925. Instead, Paragraph 5(g) forbids any negative speech about City or Department misconduct except for reporting police "discrimination or profiling." City or Department misconduct, or any other City-related

---

**[3]** General Order 26.1.1.XIX is not the subject of this appeal, so we need not decide whether it also imposes an unlawful prior restraint.

issues, are topics that would be of interest to the community. *See, e.g.*, *Connick*, 461 U.S. at 148 (noting that a prosecutor's failure to adequately investigate and prosecute criminal cases and a prosecutor's breach of public trust are matters of public concern).

Second, Paragraph 5(g) of the amended Agreement affects citizen speech.  While some speech restricted by the amended Agreement falls within Barone's official duties, "much of the potentially affected speech does not." *Moonin*, 868 F.3d at 862.

*Moonin* guides our decision on this claim.  In *Moonin*, a highway patrol supervisor announced a new policy prohibiting certain highway patrol officers from directly contacting "ANY non-departmental and non-law enforcement entity or persons" about the department's K-9 program and drug interdiction program. *Id.* at 858–59.  We reasoned that while the policy regulated some speech that fell within the officers' official duties, such as reporting departmental misconduct, much of the affected speech did not fall within their official duties. *Id.* at 862.  We refused to assume that the officers spoke as employees "on every occasion in which they discuss information learned or opinions developed while on the job." *Id.* at 862.  For example, the broad policy forbade speech about the best K-9 training protocols, and officers were prohibited from conveying their personal opinions about any aspect of the K-9 or interdiction programs to legislators and community groups, neither of which fell within the officers' official duties. *Id.* at 863.  Therefore, the policy reached speech made by the officers in their capacities as citizens on matters of public concern, and the policy was subject to the *Pickering* balancing test. *Id.* at 862, 864.

Paragraph 5(g) restricts even more speech than the policy at issue in *Moonin*. First, Paragraph 5(g)'s restriction is not limited to a particular subject matter, unlike the restriction in *Moonin*: Paragraph 5(g) flatly bars Barone from speaking negatively about the Department, the City, or their employees. Second, while a bar on only disparaging or negative speech is narrower than a prohibition on all speech, the prohibition on negative speech "suggests that, to the extent [Paragraph 5(g)] is targeted at all, it is targeted at speech *not* made pursuant to [Barone's] official duties." *Id.* at 863.

As was the case in *Moonin*, there is a lack of "qualification regarding what types of information or opinions" are subject to Paragraph 5(g). *See id.* at 862–63. Therefore, Paragraph 5(g) does not forbid speech only in Barone's capacity as an employee. The only limiting language in Paragraph 5(g) is that Barone may report complaints of discrimination or profiling by the Department. This one clarification does not remedy an otherwise broad and open-ended prohibition on "anything" related to the Department or the City. Indeed, this language would sweep in any disagreement about the City's services, employees, or elected officials, including speech on topics or individuals that do not overlap with Barone. For example, Paragraph 5(g)'s plain language would bar Barone from criticizing the City's cleanliness, water quality, or tax and revenue policies. Commenting on these topics is well beyond Barone's duties as a CSO II.[4]

---

[4] Appellees argue that Barone, a non-lawyer, never raised prior restraint concerns during negotiations with Chief Doney. To the extent that Appellees argue that Barone waived her prior restraint claim, their argument fails. We are unaware of any binding authority requiring

Appellees' argument that Paragraph 5(g) was not intended to reach private citizen speech fails. In the prior restraint context, we focus on the chilling effect of the employer's policy on the employee's speech, rather than the employer's subjective intent. *See NTEU*, 513 U.S. at 468. We evaluate the chilling effect of the amended Agreement by examining the language of the amended Agreement itself. *Moonin*, 868 F.3d at 861 n.5 (citing *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 748 (7th Cir. 1999)). Therefore, we are concerned with "what an employee reading the policy would think the policy requires," not the subjective intent of Appellees. *Id.* An employee reading this Agreement would think the amended Agreement bars exactly what it says it bars—"anything of a disparaging or negative manner" about the Department, the City, or their employees. [5]

Citing a Seventh Circuit opinion, Appellees contend that the amended Agreement does not restrain private citizen speech because it does not contain any provisions referencing citizen speech. *See Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 383 (7th Cir. 2009). This argument has no traction. First, we are not bound by *Clarke*. Second, in *Moonin*, we concluded that the challenged policy

---

Barone to raise her specific concerns during her meetings with Chief Doney. Her challenge to the amended Agreement was raised in the initial complaint, was litigated below, and is properly before us now.

[5] Appellees suggest that Paragraph 5(g)'s reference to General Order 26.1.1XIX shows that it was never intended to reach citizen speech. Paragraph 5(g)'s introductory clause—"[c]onsistent with SPD General Order 26.1.1.XIX"—does not limit the effect of the remainder of Paragraph 5(g). *See District of Columbia v. Heller*, 554 U.S. 570, 578 (2008) ("[A] prefatory clause does not limit or expand the scope of the operative clause.").

affected the speech made by the officers in their capacities as citizens, even though the policy contained no specific reference to citizen speech. 868 F.3d at 859, 862. The same reasoning applies here: The amended Agreement need not reference citizen speech in order to be understood to forbid citizen speech.[6]

## B. The Amended Agreement Fails the *Pickering* Balancing Test.

Paragraph 5(g)'s broad language forbids speech made by Barone in her capacity as a citizen on a matter of public concern. Under *Pickering*, we next consider whether Appellees "had an adequate justification" for implementing the amended Agreement. *See Garcetti*, 547 U.S. at 418. To determine whether a justification is adequate, we weigh "the interests of the [public employee], as a citizen, in commenting upon matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Lane*, 134 S. Ct. at 2377 (alteration in original) (quoting *Pickering*, 391 U.S. at 568). In balancing these interests, we also consider whether there is a "close and rational relationship between the policy and legitimate government interests." *Gibson*, 561 F.3d at 928. We also consider "the public's interest in receiving the well-informed

---

[6] Even if a restriction's lack of a "reference to speech as a citizen" were a factor in our analysis, *Clarke*, 574 F.3d at 383, the amended Agreement would still be subject to scrutiny because this case is distinguishable from *Clarke*. In *Clarke*, the Seventh Circuit upheld a restriction that prohibited speech "related to" police officers' "official agency business." *Id.* Here, the amended Agreement's language is sweeping and, on its face, is not limited to official agency business. Therefore, the amended Agreement contains no cabining language akin to that found in *Clarke*.

views of government employees engaging in civic discussion." *Garcetti*, 547 U.S. at 419.

The burden of justifying Paragraph 5(g) rests with the government. *NTEU*, 513 U.S. at 466. Because this "ban chills potential speech before it happens," as opposed to "an adverse action taken in response to actual speech," the government's burden is greater. *Id.* at 468. Appellees fail to meet their burden here.

Appellees assert several justifications. Most are restatements of general principles about the interest of government employers in regulating the speech of their employees. However, these general principles, detached from any evidence in the record, do not justify the restrictions in Paragraph 5(g). *See id.* at 475 ("[W]hen the Government defends a regulation on speech as a means to . . . prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'" (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994))); *see also Gibson*, 561 F.3d at 928 (requiring "a close and rational relationship between the policy and legitimate governmental interests").

Appellees also justify the restraints in Paragraph 5(g) by claiming that they help maintain the effective and efficient operation of the Department, and protect against potentially disruptive speech by Barone. These justifications also are inadequate, separately or jointly.

First, Appellees argue that the City has an "interest . . . in maintaining the effective and efficient operation of the police department," *Dible v. City of Chandler*, 515 F.3d 918, 928 (9th Cir. 2008), which requires that police officers safeguard the public's opinion of them. In *Dible*, we held that a city's interest in effective and efficient operation of the

police department outweighed an officer's interest in maintaining a sexually explicit website featuring videos and photos of the officer and his wife. *See id.* at 927–29. This is because society "expects officers to behave with a high level of propriety" and "[t]he law and [officers'] own safety demands that they be given a degree of respect." *Id.* at 928. Once the officer's website became public, the officer's "indecent public activities" undermined that respect, the public began denigrating other officers, potential recruits questioned other officers about the website, and the department feared that the website would reduce its ability to recruit female officers. *Id.* With this specific conduct in mind, we held that the government adequately justified its disciplinary action.

However, in *Moonin*, we rejected the government's justification that it sought to "ensur[e] effective operation of the agency without disruption" by preventing officers from speaking to non-law enforcement entities about certain police programs. 868 F.3d at 865. While we recognized that "police departments would operate more efficiently absent inquiry into their practices by the public," we reasoned that "efficiency grounded in the avoidance of accountability is not, in a democracy, a supervening value." *Id.* at 866.

The prior restraint in this case more closely resembles the restriction in *Moonin* than the post hoc disciplinary action in *Dible*. As in *Moonin*, the Department may be more efficient if the public holds a positive view of the Department and the City, and preventing any negative or disparaging speech about both the City and the Department would help maintain that positive view. However, maintaining efficiency through "avoidance of accountability" and limiting "inquiry into [its] practices by the public," *id.*, is not an acceptable justification in a

democratic society.  Indeed, avoiding accountability is a greater concern here than in *Moonin* because Paragraph 5(g) bars only disparaging or negative speech, and contains no limiting language cabining the bar to certain subject matters. Thus, this justification fails.

Second, citing Barone's previous comments, Appellees express concern about potential disruptive speech by her in the future.  In the past, Barone expressed her disagreement with the Department, including statements to the City Manager that other officers lied during her internal affairs investigations.  According to Appellees, these previous accusations and Barone's recent investigation may cause her to discuss publicly her displeasure with the Department. Appellees argue *Moonin* is distinguishable because there was no similar evidence of past disruption in *Moonin*.

This justification also fails.  The government has an interest in preventing speech that it reasonably believes will disrupt the workplace, *see Connick*, 461 U.S. at 154, and the government may justify this policy through evidence of past disruption or evidence that the anticipated harm is "real, not merely conjectural," *Moonin*, 868 F.3d at 867–68 (quoting *NTEU*, 513 U.S. at 475).  However, even assuming Appellees provided sufficient evidence of past workplace disruption by Barone, there is not a sufficiently "close and rational relationship" between its interest and Paragraph 5(g)'s broad prohibition on speech. *Gibson*, 561 F.3d at 928. Paragraph 5(g)'s restriction is not limited to employment-related speech, let alone speech that reasonably could cause a disruption at the Department.  For instance, Appellees fail to explain how Paragraph 5(g)'s restriction of speech about unrelated matters "related to the . . . City of Springfield" will "alleviate" the Department's concern about workplace disruption "in a direct and material way."  *Moonin*, 868 at

867–68 (quoting *NTEU*, 513 U.S. at 475). This failure is fatal to this justification. Concerns about potentially disruptive speech may justify a narrower restriction on speech, but Paragraph 5(g)'s sweeping restriction goes well beyond a permissible restraint under *Pickering*.

Moreover, Appellees' justifications are inadequate collectively because Paragraph 5(g) is not tailored to speech that implicates the Department's justifications. *See Moonin*, 868 F.3d at 866–67 (concluding the government's three justifications, two of which were valid, did not justify the police department's "sweeping" and "expansive" policy). Paragraph 5(g) makes no distinction between speech that reasonably could be expected to disrupt the Department's operations and speech that will not cause a disruption. Nor is it targeted to communication conveyed only in Barone's official capacity or communication that would otherwise negatively impact the Department's effectiveness and efficiency. For example, neither justification explains Paragraph 5(g)'s prohibition on speech concerning "anything . . . related to the . . . City" or employees wholly unrelated to the Department. In addition, Paragraph 5(g)'s targeted focus on only "disparaging or negative" speech renders the amended Agreement a posterchild of overt viewpoint discrimination. *See, e.g.*, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988).

The amended Agreement restrained Barone's speech as a private citizen on matters of public concern, and Appellees have not presented justifications sufficient to warrant Paragraph 5(g)'s overbroad restrictions. We thus hold that Paragraph 5(g)'s prospective restriction violated the First Amendment.

## III.    *Monell* **Liability**

It is well established that a city or other local government entity may be liable in a § 1983 action under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), when the plaintiff proves that the municipality caused the plaintiff's injury. *Connick v. Thompson*, 563 U.S. 51, 60–61 (2011). A § 1983 plaintiff can establish municipal liability in three ways: (1) the municipal employee committed the constitutional violation pursuant to an official policy; (2) the employee acted pursuant to a longstanding practice or custom; and (3) the employee functioned as a final policymaker. *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004).

Here, the issue is whether Chief Doney acted as a final policymaker in the area of employee discipline for the Department.[7]  We look to state law to answer this question. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). "Authority to make municipal policy may be granted directly by a legislative enactment" or "delegated by an official who possesses such authority . . . ."   *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).  We conclude that the City Manager possessed final policymaking authority, and that there is a triable issue of material fact whether the City Manager delegated his final policymaking authority over employee discipline in the Department to Chief Doney.

---

[7] The parties discuss only the third category, and do not discuss whether there is "a longstanding practice or custom" of the City Manager delegating his authority over employee discipline to Chief Doney. *See Lytle*, 382 F.3d at 982.  Because this issue was not raised on appeal, we decline to address this theory of *Monell* liability.  On remand, however, the district court may consider whether *Monell* liability can be established through the existence of a longstanding practice or custom.

A municipal policy may arise where a government "chooses a course of action tailored to a particular situation" that is "not intended to control decisions in later situations." *Id.* at 481. The course of action must be "made from among various alternatives by the official . . . responsible for establishing final policy" on the subject matter in question. *Id.* at 483; *see City of Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985) ("'[P]olicy' generally implies a course of action consciously chosen from among various alternatives . . . ."). Therefore, we look to whether the individual had final policymaking authority "in a particular area, or on a particular issue." *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997).

Oregon law provides that "[t]he powers of the city shall be vested in the [city] council." Or. Rev. Stat. § 221.120(6). In turn, the City of Springfield Charter, governing the city council, delegates to the City Manager the authority to "prescribe rules governing the non-discriminatory recruitment, selection, promotion, compensation, transfer, demotion, suspension, layoff and dismissal of City employees." The City Charter does not delegate any authority to the Chief of Police.

Barone argues that the City Manager was not the final policymaker by reading the City Charter in an unduly narrow fashion. She contends that the City Charter did not grant the City Manager the sole authority over personnel decisions, but rather the authority only to more broadly "prescribe rules" about personnel decisions. This argument is

unconvincing.  First, she points to no authority that supports this distinction.**[8]**

Second, and more importantly, the City Charter delegated the pertinent final policymaking authority to the City Manager.**[9]**  The final policymaker is the individual who had authority in the particular area where the constitutional violation occurred.  *See, e.g.*, *Jett*, 491 U.S. at 738 (examining whether a supervisor "possessed final policymaking authority in the area of employee transfers" when a plaintiff alleged he was transferred because of his race).  In this case, the relevant area of policymaking is employee discipline because the constitutional violation was requiring Barone to sign the amended Agreement in order to

---

**[8]** Barone contends that the city charter in *Gillette v. Delmore*, 979 F.2d 1342 (9th Cir. 1992), granted the city manager "sole authority over personnel decisions," and therefore we held that the city manager was the final policymaker, unlike the case at bar.  We do not have at our disposal the language of the city charter in *Gillette*, however, and therefore we cannot say whether the city charter in *Gillette* and the Springfield City Charter are different.

**[9]** Barone's argument also undercuts her position that Chief Doney possessed final policymaking authority.  If the City Charter did not delegate final policymaking authority over employee discipline to the City Manager, that authority remained "vested in the [city] council," Or. Rev. Stat. § 221.120(6), not with Chief Doney.  Absent another provision in the City Charter delegating this authority to Chief Doney, we cannot "assum[e] that municipal policymaking authority lies somewhere other than where the applicable law purports to put it."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (plurality opinion).  In order for Chief Doney to possess final policymaking authority, the individual originally granted this authority—here, the City Manager—must have delegated it to Chief Doney.  Therefore, Barone's reading of the City Charter would preclude her own argument that Chief Barone possessed final policymaking authority because there is evidence that "whatever decision [Chief Doney] made, the city manager would support."

keep her position at the Department.  This decision was within the purview of the City Manager under the City Charter—requiring Barone to sign the amended Agreement was a "rule[] governing" her "suspension, layoff and dismissal."  The City Charter therefore delegated final policymaking authority to the City Manager.

Because the City Charter delegated final policymaking authority to the City Manager, we now consider whether he delegated final policymaking authority over employee discipline in the Department to Chief Doney.  Appellees liken this case to *Gillette v. Delmore*, wherein we concluded that a fire chief's decision to discipline a fire fighter did not trigger *Monell* liability because the city charter "grant[ed] authority to make City employment policy only to the City Manager and the City Council."  979 F.2d at 1350.  The fire chief possessed "the discretionary authority to hire and fire employees," but this authority was "not sufficient to establish a basis for municipal liability."  *Id.* at 1350.  Appellees argue that, similar to the fire chief in *Gillette*, Chief Doney possessed only discretionary authority.

We disagree.  The plaintiff in *Gillette* failed to provide evidence that the City Manager delegated final policymaking authority to the fire chief.  *See id.* ("Gillette points to neither law nor evidence that suggests the district court erred in relying on or interpreting the applicable municipal law to determine who made final employment policy for the City.").  In contrast, the record before us contains evidence that the City Manager delegated his final policymaking authority over employee discipline in the Department to Chief Doney.  For example, Chief Doney conceded that "the buck stops" with him "[w]ithin the department"; Director Utecht admitted that "whatever decision [Chief Doney] made, the city manager would

support in this case"; and the City Manager testified that he had "no role" in the decision to fire or discipline Barone. These statements create a triable issue of material fact about who possessed final policymaking authority on employee discipline for the Department.

Because there is a genuine issue of material fact about whether the City Manager delegated final policymaking authority to Chief Doney, the district court erred in granting summary judgment in favor of the City. If the City Manager delegated the relevant authority to Chief Doney, the City would be liable under *Monell* for Chief Doney's decision to require Barone to sign the amended Agreement. We therefore reverse and remand for consideration of whether the City can be held liable for Chief Doney's conduct for the reasons herein noted. *See Ulrich v. City & County of San Francisco*, 308 F.3d 968, 985–86 (9th Cir. 2002).

## CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment on the First Amendment retaliation claim, reverse on the prior restraint claim, and reverse and remand on the issue of *Monell* liability.

Each party shall bear its own costs on appeal.

AFFIRMED IN PART, REVERSED IN PART, REMANDED.